Jack **WEHR**, Plaintiff–Appellee, Cross–Appellant,

v.

**RYAN'S FAMILY STEAK HOUSES, INC.,** Defendant–Appellant, Cross–Appellee.

Nos. 94–5057, 94–5099.

United States Court of Appeals, Sixth Circuit.

Argued Jan. 30, 1995.

Decided March 17, 1995.

Edward S. Monohan (argued and briefed), Ware & Monohan, Florence, KY, for plaintiff - appellee, cross-appellant.

Lewis F. Gossett (briefed), Ingrid J. Blackwelder (argued and briefed), Ogletree, Deakins, Nash, Smoak & Stewart, Greenville, SC, for defendant - appellant, cross-appellee.

Before: WELLFORD, BOGGS, and SILER, Circuit Judges.

WELLFORD, Circuit Judge.

Plaintiff, Jack Wehr, began to work for defendant, Ryan's Family Steak Houses, Inc. (Ryan's), in mid–1990. After a training course and some months of job experience at a beginning level of management, Wehr was promoted in December, 1990, from the fourth management position to the third management spot at the Florence, Kentucky store. Wehr worked under Mike Tanner, the general manager, and Larry Sanchez, the district manager.

In January, 1991, just one month after being promoted to third manager, Wehr was given an unfavorable review. Wehr explains that his low rating was partially due to his inexperience with Ryan's, but that the main reason for the low rating was his refusal to condone and participate in alleged sexual harassment of waitresses by Sanchez and Tanner.

Several witnesses testified at trial about the favoritism shown to young, attractive female employees who attended parties with Tanner and Sanchez on their respective houseboats. Sharon Newby, a former waitress at Ryan's, testified that "management was always flirting with the young girls." To reward these young waitresses, Tanner and Sanchez would schedule them to work in the front sections of the restaurant where the turnover of customers was higher and, accordingly, the nightly tips greater. Older waitresses were regularly placed in the less desirable back sections of the restaurant.

There was evidence, if believed by the jury, that harassment problems were pervasive and readily apparent, as demonstrated by the number of witnesses who testified at trial about it. Several waitresses testified at trial about the favoritism, and two of these waitresses, April Wilder and Janet Noonan, testified that Tanner and Sanchez had asked them for sexual favors.[1] Pam Green, the second-line manager at the time, also testified that she had complained several times to Tanner about the favoritism, but that she had been retaliated against for doing so.

In February of 1991, after several waitresses complained to Wehr,[2] he contacted Rick Erwin, Ryan's regional vice president of operations, to register his own objection. This call, which involved bypassing Tanner and Sanchez, turned out to have an adverse effect on Wehr's career at Ryan's.

After receiving Wehr's voice-mail message, Erwin arrived at the Florence store the next day to "investigate" the charges. Plaintiff contended that Erwin's investigation was neither thorough nor sincere. According to Wehr, Erwin was agitated with him in his interview at the restaurant. When pressed by Erwin, Wehr gave him the names of the two young waitresses that were the main subjects of Tanner's and Sanchez's alleged improper attentions—April Wilder and Nicole Bolin. Erwin then asked Wilder and Bolin if they had been harassed, and both denied that it had occurred. Wilder, however, testified that this response grew out of her apprehension about her job. Erwin did not ask any of the older waitresses about the favoritism about which Wehr had informed him. Nor did Erwin document his investigation about sexual harassment, although he did document the portion of his conversation with Wehr regarding Wehr's claim for unpaid hours of work.

---

1. For example, Janet Noonan testified that Tanner had told her "if she didn't go out and party and actually have sex with him, that she would never get any easy volume work."

2. Waitresses Janet Noonan and April Wilder testified at trial that they had complained to Wehr about the favoritism, a derivative of Tanner's and Sanchez's alleged sexual interests in the younger waitresses.

Three weeks after this meeting at the restaurant, Ryan's discharged Wehr. Ryan's basis for the discharge was excessive tardiness and absenteeism, although Ryan's did not have a written record of Wehr's deficiencies in that respect. Instead, Ryan's points to an incident that occurred on March 5, 1991, when Wehr left Ryan's earlier than scheduled after stating that he was not feeling well. Ryan's claimed that Wehr failed to check out properly and did not discuss leaving with Tanner. Wehr claims, however, that he showed Tanner his doctor's statement about his illness.[3] The next morning, Tanner called Wehr and discharged him.

Wehr then brought suit against Ryan's under Title VII, alleging that he had been fired in retaliation for reporting sexual harassment violations. *See* 42 U.S.C. § 2000e–3(a). After hearing disputed proof, the jury agreed, but awarded Wehr only $2,000 in back pay. Wehr then amended his complaint to request the court to order reinstatement, which the magistrate judge granted. The court also awarded Wehr $30,065.63 in attorney fees and $1,196.90 in costs, although Wehr had requested $103,175.50 in attorney fees and $1,773.75 in costs.

Ryan's challenged each of these awards, alleging that during discovery it had learned that Wehr had lied about his employment background and medical history on his resume, including misstatements about his past mental stability and the circumstances of his leaving a former employer. Ryan's also alleged that they had discovered that Wehr had sexually harassed Tammy Farrell, a female waitress under Wehr's supervision. Ryan's claims that had they known of any of these incidents during Wehr's employment, they would have fired him. Ryan's argued that this circuit's after-acquired evidence rule prevents Wehr from recovering for the Title VII violation under our decision in *Johnson v. Honeywell Info. Sys., Inc.*, 955 F.2d 409 (6th Cir.1992), and its progeny. The magistrate judge, however, rejected these arguments and denied Ryan's motion for judgment notwithstanding the jury's verdict.

On appeal, Ryan's renews its argument that *Honeywell* prevents Wehr from any recovery, including back pay, reinstatement, injunctive relief, and attorney fees. Ryan's also argues that Wehr did not have a good faith belief that sexual discrimination violations had occurred, and thus, he could not seek protection under 42 U.S.C. § 2000e–3. Wehr cross-appeals, challenging the amount of the district court's award of attorney fees. We have jurisdiction over this appeal under 28 U.S.C. § 1331.

## I. STANDARD OF REVIEW

This court's standard of review of denial of a motion for a judgment notwithstanding the verdict is identical to the standard used by the district court. We do not weigh the evidence, evaluate the credibility of the witnesses, or substitute our judgment for that of the jury. Instead, we must view the evidence in the light most favorable to the party against whom the motion is made, and give that party the benefit of all reasonable inferences. The motion should be granted, and we should reverse the district court's decision, only if reasonable minds could not come to a conclusion other than one in favor of the movant. *Phelps v. Yale Sec., Inc.*, 986 F.2d 1020, 1023 (6th Cir.), *cert. denied*, —— U.S. ——, 114 S.Ct. 175, 126 L.Ed.2d 135 (1993).

## II. THE AFTER–ACQUIRED EVIDENCE RULE

In *Johnson v. Honeywell Information Sys., Inc.*, 955 F.2d 409 (6th Cir.1992), we first applied the after-acquired evidence rule in the employment discrimination context, holding that an employer could escape any liability for its discriminatory actions if the company learned, after the fact, of an otherwise legitimate reason for taking the adverse employment action. In *Honeywell*, a female managerial employee sued her former employer for violating several Michigan laws

---

**3.** Tanner claims that Wehr never presented the written doctor's excuse. This fact, however, does not appear to be crucial as Erwin conceded in his testimony that a written doctor's excuse would not have changed his decision to terminate Wehr's employment.

prohibiting discrimination. The company, during discovery, learned that the employee had falsified the educational and experience portions of her resume. Although she had claimed to have earned a college degree, a prerequisite for the job, she had taken only four courses at the local university. Interpreting Michigan law, we held that "just cause for termination of employment may include facts unknown to an employer at the time of dismissal, though obviously such facts would be neither the actual nor inducing cause for the discharge."

In *Milligan–Jensen v. Michigan Tech. Univ.*, 975 F.2d 302 (6th Cir.1992), *cert. granted*, —— U.S. ——, 113 S.Ct. 2991, 125 L.Ed.2d 686 (1993), *cert. dismissed*, —— U.S. ——, 114 S.Ct. 22, 125 L.Ed.2d 773 (1993), we extended our application of the after-acquired evidence to cover Title VII claims. Again, we provided the employer complete relief from liability for its allegedly discriminatory actions because the former campus police officer had falsified her employment application when applying for the position. In reversing the district court, which had provided the employee with partial relief, we affirmed our holding in *Johnson* that an employee who makes material misrepresentations on her employment application may be denied all relief even if she is a victim of a discriminatory discharge.

We have also applied the after-acquired evidence rule when employee misconduct, rather than resume fraud, is the basis of the employer's later after-acquired evidence. *See McKennon v. Nashville Banner Pub. Co.*, 9 F.3d 539 (6th Cir.1993), *rev'd*, —— U.S. ——, 115 S.Ct. 879, 130 L.Ed.2d 852 (1995). The Supreme Court has recently unanimously reversed this court in the *McKennon* case. While *McKennon* involved an ADEA claim, we are persuaded by its language that it applies equally to a Title VII claim.

The ADEA and Title VII share common substantive features and also a common purpose: "the elimination of discrimination in the workplace...."

It would not accord with this scheme if after-acquired evidence of wrongdoing that would have resulted in termination operates, in every instance, to bar all relief for an earlier violation of the Act.

*McKennon*, —— U.S. at ——, 115 S.Ct. at 884.

Based on this holding in *McKennon*, we find no error in the court's denial of Ryan's motion for judgment notwithstanding the verdict insofar as the award of damages (loss of pay) and award of attorney fees are concerned.[4] There was sufficient evidence to support these awards, as well as sufficient evidence that supports the lower court's finding that Wehr had a good-faith belief that sexual discrimination violations had occurred. The question of reinstatement relief, however, may present further problems for Wehr.

## III. *REINSTATEMENT*

The Supreme Court in *McKennon* held that "even though the employer has violated the Act, we must consider how the after-acquired evidence of the employee's wrongdoing bears on the specific remedy to be ordered." *Id.* at ——, 115 S.Ct. at 885. Wehr's misconduct, if any, is relevant to the question of reinstatement. *McKennon* reminds us that "[t]he employee's wrongdoing must be taken into account ... lest the employer's legitimate concerns be ignored." *Id.* at ——, 115 S.Ct. at 886. *See also* 29 U.S.C. § 626(b) (authorizing courts to issue "appropriate equitable relief to effectuate the purposes of the statute."). The judge must, in this regard, "take due account of the lawful prerogatives of the employer in the usual course of business and the corresponding equities...." *McKennon*, —— U.S. at ——, 115 S.Ct. at 886. The Supreme Court went further in *McKennon* to emphasize that "as a general rule in cases of this type, neither

---

4. We find no abuse of discretion in the court's determination of a reasonable award of attorney fees and costs. If the district court on remand alters the relief granted to Wehr, it has the discretion to revisit the amount of attorney fees, pursuant to *Farrar v. Hobby*, —— U.S. ——, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992).

reinstatement nor front pay is an appropriate remedy." *Id.*

We believe that Wehr's emotional stability and resume fraud are relevant and should be considered fully in light of *McKennon*'s directives. This same consideration is due on the question of whether Wehr himself was guilty of sexual harassment.[5] If the lower court finds merit to either of these charges, "[i]t would be both inequitable and pointless to order the reinstatement of someone the employer would have terminated ... in any event and upon lawful grounds." *Id.*

We, accordingly, remand the issue of reinstatement for further factual determination and a balancing of equities in light of the Supreme Court's decision in *McKennon*. We remind the district court that "[o]nce an employer learns about employee wrongdoing that would lead to a legitimate discharge, we cannot require the employer to ignore the information, even if it is acquired during the course of discovery in a suit against the employer...." *Id.* The court, upon remand, may also "consider taking into further account extraordinary equitable circumstances that affect the legitimate interests of either party." *Id.*

Accordingly, we **AFFIRM** the jury verdict and the award of attorney fees. We **REMAND** for further consideration under *McKennon* the question of reinstatement of Wehr.

---

5. When an employer "seeks to rely upon after-acquired evidence of wrongdoing, it must first establish" that the wrongdoing in fact occurred, and "that the wrongdoing was of such severity that the employee in fact would have been terminated...." *McKennon,* —— U.S. at —— –——, 115 S.Ct. at 886–87.