Gerald MOORE, Plaintiff–Appellee,

v.

**KUKA WELDING SYSTEMS & Robot Corporation and Expert Automation Inc., d/b/a Expert KUKA, Defendants–Appellants.**

No. 97–1734.

United States Court of Appeals, Sixth Circuit.

Argued Sept. 24, 1998.

Decided March 26, 1999.

John C. Cashen (argued and briefed), Bodman, Longley & Dahling, LLP, Troy, MI, for Defendants–Appellants.

Robert Van Cleef (argued and briefed), Southfield, MI, for Plaintiff–Appellee.

Before: MERRITT, SILER, AND GILMAN, Circuit Judges.

MERRITT, Circuit Judge.

Defendants KUKA Welding Systems + Robot Corporation and Expert Automation, Inc. appeal from the district court's entry of judgment against them after a jury verdict in favor of plaintiff Gerald Moore in his Title VII claims alleging hostile work environment, constructive discharge and retaliation. The jury awarded plaintiff both compensatory and punitive damages. Specifically, defendants appeal the denial of their motion for judgment as a matter of law at the close of plaintiff's case, the denial of their motion for a new trial and the award of damages, as well as an evidentiary hearsay question. This is a close case, but our review of the record leads us to conclude that there is no valid basis to overturn the jury's verdict.

## I.

Plaintiff Gerald Moore, an African American, worked as a friction welder for defendants KUKA Welding Systems + Robot Corporation and Expert Automation, Inc. from September 1993 to April 1996, when he quit his job. He had previously worked for Thompson Welding, beginning in 1991, but went to work for KUKA when KUKA bought Thompson Welding in September 1993. When KUKA took over Thompson Welding in September 1993, it paid plaintiff $10.00 per hour, which was considered by KUKA to be "in line with the rest of the guys" on the shop floor and was an increase of $1.00/hour over his pay at Thompson Welding.

Plaintiff was the only black on the shop floor among 15–20 employees. Another black man was an engineer at the company, but he did not work on the floor and there was a black janitor named Melvin Gibson, who testified for plaintiff at trial. Tom McCauley, who is white, was plaintiff's supervisor at KUKA from September 1993 until shortly before plaintiff left in April 1996.

In March 1994, about six months after plaintiff started with KUKA, he was asked to train a new employee, Jeff Bambard, who is white. Bambard was hired as a "machine builder," a job considered more skilled than plaintiff's job as a "friction welder." In September 1994, about six months after Bambard arrived, McCauley, the supervisor, told plaintiff that Bambard was the "leader" of the production department. There was conflicting testimony at trial about the nature of the "leader" position, but "leaders" apparently supervise other employees, although they are not formally within the management structure. Plaintiff was upset that a person whom he had trained had been made a "leader" before him.

It is undisputed from the record that plaintiff was subject to numerous racial slurs and jokes on the job and that, at least to some extent, the behavior was tolerated by the company. In June 1994, a fellow employee, Dick Lance, who is white, yelled out to plaintiff "Hey nigger, hey nigger." Lance said this in the presence of McCauley, the supervisor, who said nothing and had a "smirk" on his face and was shaking his head, according to plaintiff. Plaintiff testified that he felt "badly" about the remark and expected his supervisor to do or say something, but when McCauley did nothing, plaintiff went back to work.

In December 1994, someone wrote "kill all niggers" on the shop's bathroom wall. It was never determined who wrote it. Alan Marsee, a coworker of plaintiff's, saw it, cleaned it off the wall and reported it to McCauley. Marsee testified that upon telling McCauley about the slur, McCauley said "Gerald Moore [plaintiff] probably did it." Plaintiff was not at work that day, but heard about both the writing and McCauley's response from Alan Marsee the next day. In light of the incident, McCauley reminded the employees about the company's anti-harassment policy at the next shop floor meeting.

Plaintiff also considered it an act of racial hostility and said he was treated like a "servant" when he was asked by his supervisor to drive a fellow employee, who was white, in his car. Plaintiff testified that the supervisor told plaintiff to drive and the white man to sit in the back seat.

Plaintiff was also present when fellow employee Dick Lance told racial jokes using the word "nigger," which apparently occurred with some frequency. Lance testified that if plaintiff was present when he told a joke with a racial slur that he always asked plaintiff first if it was OK and plaintiff always said it was. In addition, supervisor McCauley admitted to using the word "nigger-rigging" when a job was poorly done, although he did not use the term in plaintiff's presence.

In September 1994, during plaintiff's first annual review with KUKA, plaintiff received the maximum raise for his position. Plaintiff did not see his actual evaluation, but it was satisfactory overall and noted several areas where plaintiff could improve. Plaintiff found out in November 1994 that Bambard, the person whom he had trained, was paid $15/hour, which was more than plaintiff's hourly wage. In December 1994, as a result of finding out about Bambard's rate of pay, plaintiff told McCauley that he would quit if he did not get a raise. McCauley arranged a meeting between himself, plaintiff and Bob Knoll, the plant manager. At the meeting plaintiff complained that he did not get paid as much as Bambard and expressed his concern that he was subject to "race words" on the job. When asked who used "race words," plaintiff refused to identify Dick

Lance as the person who called him "nigger" earlier in the year because McCauley had been there and knew who it was and had taken no action. Plaintiff also testified that he was "afraid" to identify specific people because he was the only black on the floor and had no one to turn to if he complained about white employees. Plaintiff did not get the requested raise and over his Christmas vacation he looked for a new job but could not find one so he returned to KUKA.

The strongest testimony concerning racial discrimination came after plaintiff filed a race discrimination complaint with the EEOC in January 1995. Plaintiff testified that a couple of weeks after he filed the complaint, his supervisor and the other employees began to avoid him and would not talk to him. Plaintiff testified that this isolation began in January 1995 and continued until he quit in 1996. For example, plaintiff and others testified that McCauley told the employees to move their tool boxes from the back of the shop, where plaintiff was located, so they wouldn't talk to plaintiff. In addition, Alan Marsee and Jeff Bambard were removed from the friction welding department, leaving plaintiff as the only employee in that department. McCauley testified that this was due to a downturn in work in the friction welding area.

In April 1996, plaintiff quit his job at KUKA after he found a part-time job with Ford that paid $12.54/hr, more than he made at KUKA, but with the reduced hours he made substantially less money and had no benefits. Plaintiff testified that he hoped that the Ford job would become full-time, but as of the date of the briefs in this case plaintiff was still working part-time. Plaintiff says that he left KUKA because he was tired of the racism and isolation.

The EEOC eventually issued plaintiff a right-to-sue letter. Plaintiff's complaint states claims of hostile work environment and racial discrimination under 42 U.S.C. §§ 1981, 1981a, 42 U.S.C. § 2000e (Title

VII of the Civil Rights Act of 1964) and Michigan's Elliot–Larsen Civil Rights Act, retaliation under 42 U.S.C. § 2000e–3 and the Elliot–Larsen Civil Rights Act and a claim for constructive discharge under Michigan law. After a six-day jury trial, the jury returned a verdict for plaintiff on his hostile work environment claim, his constructive discharge claim and his retaliation claim. The jury rejected plaintiff's racial discrimination claim based on disparate pay. The jury awarded damages of $20,000 for economic loss after plaintiff left KUKA, $50,000 for noneconomic damages and $70,000 for punitive damages, for a total of $140,000 in damages.

Defendants appealed the district court's failure to grant their motions for judgment as a matter of law, for a new trial and/or remittitur.

## II.

■ Denial of judgment as a matter of law is reviewed *de novo*, examining whether there is sufficient evidence to support the jury's verdict when reviewed in the light most favorable to the prevailing party. Judgment as a matter of law is appropriate only when there is a complete absence of fact to support the verdict, so that no reasonable juror could have found for the nonmoving party. *See, e.g., K & T Enterprises, Inc. v. Zurich Ins. Co.,* 97 F.3d 171, 175 (6th Cir.1996); *Wehr v. Ryan's Family Steak Houses, Inc.,* 49 F.3d 1150, 1152 (6th Cir.1995).

### A. *Hostile Work Environment*

■ Defendants contend that the jury's finding of a hostile work environment is not supported by substantial evidence. To prove that he was subject to a hostile work environment in violation of Title VII, plaintiff must prove: (1) he belongs to a protected group; (2) he was subject to unwelcome harassment; (3) the harassment was based on race; (4) the harassment affected a term, condition, or privilege of employment and (5) defendant

knew or should have known about the harassment and failed to take action. Harassment affects a "term, condition or privilege of employment" if it is sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and creates an abusive working environment. *See generally Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993); *accord Scott v. Central School Supply, Co.,* 121 F.3d 709 (6th Cir.1997) (unpublished). In sum, the plaintiff's evidence must be sufficient to show that the alleged conduct constituted an unreasonably abusive or offensive work-related environment or adversely affected the employee's ability to do his or her job. *Erebia v. Chrysler Plastic Prods. Corp.,* 772 F.2d 1250, 1256 (6th Cir.1985).

■ Once this hostile environment is demonstrated, the plaintiff must then show that the employer tolerated the conditions. In order to hold the employer liable for the conduct of coworkers, the plaintiff must establish that the employer knew or should have known of the alleged conduct and failed to take prompt remedial action. *Id.*

■ While not overwhelming, the evidence, when viewed in its entirety, is sufficient to support the jury's finding of a racially hostile work environment. That racial slurs and jokes took place at KUKA is undisputed. The offensive conduct was not isolated—it appears that racial slurs and offensive jokes were part of the everyday banter on the shop floor. It is also undisputed that defendants knew about the jokes and use of slurs and did little to correct this problem and in some cases took part in or implicitly condoned the conduct. For example, when plaintiff was called a "nigger" by coworker Dick Lance in front of their supervisor Tom McCauley, McCauley did nothing. When McCauley

was informed about a racial slur written on the bathroom wall, he commented that plaintiff probably did it, even though plaintiff was not at work that day and there was no evidence that plaintiff had anything to do with it. There was also testimony that plaintiff was instructed to drive a white employee and the white employee was to sit in the back, presenting the appearance that plaintiff was "chauffeuring" the white employee. There is also testimony that Tom McCauley used the word "nigger-rigging" to refer to poor workmanship. Although apparently not used within plaintiff's hearing or even directed at plaintiff, plaintiff knew that the derogatory term was used. Although plaintiff did not directly complain to his supervisors about the problem until December 1994, McCauley, a supervisor, observed and in some instances contributed to the offensive conduct at KUKA, thereby putting defendants on notice of the conduct.

What apparently had the greatest impact on plaintiff's inability to tolerate his work situation was his isolation from his coworkers after filing his EEOC complaint.[1] Plaintiff and others testified that plaintiff was increasingly isolated from his coworkers over time. Employees were instructed not to talk to plaintiff and to remove their tool boxes from his area so they would have no reason to go back there. The janitor was instructed not to clean plaintiff's area.

There is no bright line between harassment and merely rude or obnoxious behavior, but the case presents sufficient evidence to support the jury's verdict of a racially hostile work environment.

**B. Retaliation**

■ Plaintiff next contends that the company retaliated against him after he

---

1. We note that isolation from one's offensive coworkers could be viewed as remedial action by an employer to an employee's complaint about his work environment. When asked at oral argument about this defense, however, defendants stated that any isolation complained of by plaintiff was simply the nature of his job and not an affirmative response to his complaints.

filed his complaint with the EEOC. Specifically he alleges that he was intentionally isolated from the other employees. He alleges that the other employees were instructed by management not to talk to him, go into his area or otherwise interact with him. Defendants counter that the isolation was simply the nature of plaintiff's job. Friction welding was not a big part of the overall operation and did not often intersect with the jobs performed by the other workers.

 To establish retaliation under Title VII, a plaintiff must show (1) that he engaged in a protected activity; (2) that he suffered an adverse employment action and (3) that the adverse action occurred because of the protected activity. *Canitia v. Yellow Freight System, Inc.*, 903 F.2d 1064, 1066 (6th Cir.1990). The Elliott–Larsen Act, M.C.L. § 37.2701(a), requires the plaintiff to demonstrate that (1) he opposed violations of the Act or participated in an activity protected by the Act and (2) his opposition or participation was a "significant factor" in the adverse employment action. The causal connection between the adverse employment action and the protected activity, here the filing of a complaint with the EEOC, may be established by demonstrating that the adverse action was taken shortly after plaintiff filed the complaint and by showing that he was treated differently from other employees. Plaintiff presented sufficient evidence that his isolation was prompted by the filing of his complaint.

The proximity in time between the increased isolation and the filing of the EEOC complaint allows an inference by the jury that the isolation was in retaliation for undertaking the protected activity of filing the complaint. *See, e.g., Harrison v. Metropolitan Gov't of Nashville and Davidson Cty., Tenn.*, 80 F.3d 1107, 1118–19 (6th Cir.1996). Other incidents that occurred after plaintiff filed the EEOC complaint were related to the jury by plaintiff and others. These include more frequent disciplinary writeups of plaintiff for trivial matters and unwarranted criticism of plaintiff's work. When viewed as a whole these separate incidents support the jury's finding that defendants retaliated against plaintiff.

### C. *Constructive Discharge*

 Plaintiff contends that the hostile work environment and the isolation he suffered after filing his EEOC complaint caused his constructive discharge. To constitute a constructive discharge, the employer must deliberately create intolerable working conditions, as perceived by a reasonable person, with the intention of forcing the employee to quit and the employee must actually quit. To determine if there is a constructive discharge, both the employer's intent and the employee's objective feelings must be examined. *E.g., Held v. Gulf Oil Co.*, 684 F.2d 427, 432 (6th Cir.1982). Intent can be shown by demonstrating that quitting was a foreseeable consequence of the employer's actions. The plaintiff must show more than a Title VII violation to prove constructive discharge, so the fact that plaintiff may have proven a hostile work environment is not enough by itself to prove constructive discharge also. *Jenkins v. Southeastern Mich. Chapter, Am. Red Cross*, 141 Mich. App. 785, 796, 369 N.W.2d 223, 229 (1985)(applying Elliott–Larsen Civil Rights Act).

 Like plaintiff's hostile work environment claim, this claim also presents a close question. We find, however, that the evidence is sufficient for the jury to have found that a reasonable person in plaintiff's position would have felt compelled to resign. In particular, the testimony supports a finding that plaintiff was so increasingly isolated after filing his EEOC claim that it was reasonable for the jury to infer that defendants intended for plaintiff to quit.

Day after day, week after week of isolation on the job and lack of communication would lead him to believe that he was

no longer wanted and would continue to receive the cold shoulder as long as he worked there.

### D. *Evidentiary Ruling Regarding "Double Hearsay"*

■ Defendants also argue that the district court erred in allowing testimony it characterizes as "double hearsay." The court allowed plaintiff's witness, Alan Marsee, to testify over defendants' objection that Marsee's brother-in-law, David Morris, a machine builder at KUKA, told Marsee at a social occasion at Marsee's home that Tom McCauley, plaintiff's supervisor, told Morris "some bad stuff's going to happen in the back" (presumably referring to the friction welding area) and that Marsee should stay out of it unless he wanted to be fired. The district court allowed this alleged "double hearsay" under Federal Rule of Evidence 802(d)(2) as a statement against interest that is non-hearsay. McCauley, the supervisor, was also a witness in this case and was subject to examination by both sides.

As an initial matter there is a question about whether the statement meets the definition of hearsay: an out-of-court statement "offered in evidence to prove the truth of the matter asserted." Fed. R.Evid. 801(c). The inference that the plaintiff wishes us to draw here is that the supervisor's statement to the employee shows the company's state of mind of retaliation against plaintiff and permits an inference that the employer felt vindictive toward plaintiff. The statement would therefore seem to be circumstantial evidence of a relevant fact—the company's intent to retaliate against plaintiff. It is therefore arguably hearsay because it goes to prove the fact of the matter asserted— that the company impermissibly retaliated against plaintiff for filing a discrimination claim. However, we need not decide whether the statement meets the definition of hearsay.

Rule 801(d)(2), the rule relied upon by the district court to admit the statement, governs the admissibility of party-opponent admissions. Specifically, subsection (d)(2)(D) says that a statement is not hearsay if it is a statement "by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship . . . ." Each level of hearsay must fall within an exception to Rule 801 to be admissible. Fed.R.Evid. 805.

Plaintiff argues that the statement is admissible under this exception to the hearsay rule because David Morris, who plaintiff claims is one of the ill-defined "leaders" at KUKA, was an agent of KUKA and McCauley, who in fact was a supervisor at KUKA, considered Morris his agent and instructed Morris to make the statement to Marsee.

Given McCauley's supervisory position, his statement to Morris is not hearsay under Rule 801(d)(2)(D) and is admissible. The second level of hearsay, that is, the statement from Morris to Marsee, is more problematic. Morris is clearly not an agent of KUKA. However, given the fact that there is testimony that McCauley *told* Morris to pass the message along to Marsee allows some leeway in finding that McCauley considered Morris an agent and used him as an agent of the company. Under this circumstance, even the second level statement can be viewed as non-hearsay under Rule 801(d)(2)(D) and therefore admissible. This is particularly true given the fact that McCauley was a witness subject to examination in court, not simply an out-of-court declarant. Defendants therefore had an opportunity to put before the jury their version of the event in question. They could ask McCauley his version of the facts concerning the statement and its meaning. The hearsay dangers underlying out-of-court statements offered for

their truth—sincerity, memory and not under oath—are not present when the declarant takes the stand as a witness. *See* E. Morgan, *Some Problems of Proof Under the Anglo–American System of Litigation* 141–68 (1956).

### E. Motion for a New Trial

Defendants also appeal the denial of their motion for a new trial under Federal Rule of Civil Procedure 59, charging that the verdict was against the great weight of the evidence.

■ When reviewing denial of a motion for a new trial, we must evaluate whether the verdict is supported by the evidence; that is, whether a reasonable juror could reach that verdict based on the facts and the law. *Tennant v. Peoria & P.U. Ry. Co.*, 321 U.S. 29, 35, 64 S.Ct. 409, 88 L.Ed. 520 (1944); *accord Bruner v. Dunaway*, 684 F.2d 422, 425 (6th Cir.1982). For the reasons discussed above, we cannot say that the district court erred in denying the motion.

### F. Damages

Under Title VII, prevailing plaintiffs may recover, in addition to compensatory damages for economic loss, compensatory damages for "future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses." 42 U.S.C. § 1981a (b)(3); *Landgraf v. USI Film Prods.*, 511 U.S. 244, 253, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994).

■ Under Title VII prevailing plaintiffs may also recover punitive damages under 42 U.S.C. § 1981a (b)(1) if they demonstrate that the defendant engaged in discriminatory practices "with malice or with reckless indifference to the federally protected rights of an aggrieved individual." Something more than just intentional conduct is necessary for an award of punitive damages.

Here, plaintiff was awarded $20,000 for compensatory economic loss, $50,000 for compensatory noneconomic loss and $70,000 in punitive damages.

■ **1. Compensatory Damages.** Defendants contend that the jury award for compensatory damages is not supported by substantial evidence because there was insufficient proof that plaintiff suffered any injury, such as emotional distress. In *Carey v. Piphus*, 435 U.S. 247, 264, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978), the Supreme Court held that compensatory damages cannot be awarded absent proof of injury. *Accord Rodgers v. Fisher Body Div., Gen. Motors Corp.*, 739 F.2d 1102 (6th Cir.1984). In *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993), the Supreme Court held that a compensable injury in a hostile work environment claim need not rise to the level of affecting the psychological well-being of the victim, but there must be proof of some mental distress. *Id.* at 22, 114 S.Ct. 367.

Here, plaintiff testified that he was injured because he was "angry" and "upset" about the jokes and slurs and that he "just couldn't take it any more." Plaintiff also complained to his supervisors and started looking for a new job. Accepting plaintiff's narration of the facts as true, this evidence sufficiently demonstrates the requisite injury to support compensatory damages.

■ Furthermore, the damages must be proportional to the injury. We cannot say that the $70,000 award by the jury for compensatory damages is excessive when balanced against the harassment and isolation suffered by plaintiff over time. Plaintiff put up with a fairly steady stream of racial jokes and slurs during his employment, including insensitive conduct and comments by supervisors. Plaintiff

was also intentionally isolated from his coworkers in retaliation for filing an EEOC complaint. The totality of the circumstances supports the compensatory damage award.

■ 2. *Punitive Damages.* Defendants also contend that there was insufficient evidence to support the punitive damage award. The imposition of punitive damages is limited to cases where the plaintiff can show egregious conduct or willfulness, malice or reckless indifference on the part of the defendant. *Wolfel v. Bates,* 707 F.2d 932, 934 (6th Cir.1983).

■ The jury's award of punitive damages was supported by sufficient evidence to escape a directed verdict. The fact that defendants knew and allowed the offensive conduct to continue supports the punitive damage award here. Defendants' apparent indifference to plaintiff's plight, particularly the fact that Supervisor Tom McCauley witnessed and condoned it over a two-and-one-half-year period and even participated himself to some extent, meets the "reckless indifference" standard under the case law. The statement by McCauley to Morris adds fuel to the fire and indicates that retaliation against plaintiff was planned or at least condoned by the company.

Accordingly, we affirm the judgment of the district court.