**Thomas P. JONES, Plaintiff,**

**v.**

**RAVENS, INC., Defendant.**

**No. 5:00–CV–0022.**

United States District Court,
N.D. Ohio,
Eastern Division.

Aug. 7, 2000.

Gary F. Lynch, New Castle, PA, William C. Helbley, Jr., Youngstown, OH, for Thomas P. Jones, plaintiff.

Harley M. Kastner, Kastner, Westman & Wilkins, LLC, Akron, OH, Keith L. Pryatel, Kastner, Westman & Wilkins, Akron, OH, for Ravens, Inc., defendant.

## OPINION AND ORDER

GWIN, District Judge.

On June 8, 2000, Defendant Ravens, Inc., filed a motion for summary judgment in this action arising under the Americans with Disabilities Act of 1990 ("the ADA" or "the Act"), 42 U.S.C. § 12101 *et seq.* [Doc. 16]. Ravens' primary contention is that Plaintiff Thomas P. Jones is not substantially limited in the major life activity of working. Defendant Ravens also says there is no evidence that it regarded Jones as disabled.

Upon review of the motion and relevant record materials, the Court agrees and grants Defendant Ravens' motion, dismissing this action.

## I. FACTUAL BACKGROUND

Plaintiff Thomas P. Jones is a 60–year old manager working in the transportation industry. He is a resident of New Castle, Pennsylvania.

Defendant Ravens, Inc., designs, manufactures, and sells aluminum truck trailers and bodies used in highway transportation. Ravens maintains production facilities in Ohio and North Carolina.

Before taking a position with Defendant Ravens, Plaintiff Jones was the chief executive officer of one of Ravens' competitors, Benson Trailers. Jones later joined Trailstar, a truck-trailer manufacturer in Alliance, Ohio, as its Marketing Manager.

In 1998, Defendant Ravens approached Plaintiff Jones about joining the company. At that time, Ravens' President, Lowell Morgan, was looking forward to retirement in a couple of years. Ravens believed Plaintiff Jones could be a possible presidential successor. In three separate interviews, Ravens did not ask Jones about his health or physical condition.

In negotiating a position with Ravens, Jones told Ravens representatives that he

was paid $1,765 per week at Trailstar. Defendant Ravens based Jones' salary, at least in part, on this and other representations. Ravens agreed to largely match Trailstar's remuneration by paying $3,554 bi-weekly.

In negotiating to hire Plaintiff Jones, Ravens did not discuss what specific responsibilities Jones would undertake at Ravens. There was not even a formal job title for Plaintiff when first hired at Ravens. On March 2, 1998, Plaintiff Jones began work at Ravens. Although he lived well over an hour away in New Castle, Pennsylvania, Plaintiff opted not to relocate nearby Ravens' headquarters in Akron, Ohio.

Plaintiff Jones commuted from New Castle, Pennsylvania, to Akron, Ohio, every day for his work at Ravens. The commute is just over one hour each way.

About one month after beginning his work at Ravens, Plaintiff Jones developed breathing problems. A heart catheterization revealed that Jones had coronary artery disease and an irregular heartbeat. After informing Ravens of his health problem, Jones missed one or two days of work. When Jones told Ravens President Lowell Morgan about his condition, Morgan told him, "[Y]ou know, you need to do whatever you need to do. You need to take care of your health first."

A few weeks after the catheterization procedure, Jones noticed that he became unusually drowsy. Jones attributed the drowsiness to the medications his doctor prescribed for his heart condition. However, none of the medications listed drowsiness as a possible side-effect. Jones also experienced some bloating as well as slight dizziness when standing from a kneeling or squatting position.

Upon complaining to his doctors about these symptoms, Jones's physicians prescribed a cardioversion procedure, an electric shock treatment, as the only means to correct his irregular heartbeat. Jones agreed to the undergo the procedure. But before he could undergo the procedure, Plaintiff Jones needed several blood tests that took place over several weeks.

In August 1998, Plaintiff Jones informed Ravens President Lowell Morgan that he was experiencing a lot of drowsiness. Plaintiff Jones asked for a reduced work schedule.

About six weeks after Plaintiff Jones requested a reduced work schedule, Defendant Ravens terminated Jones' employment. In firing him, Jones says Ravens executive Lowell Morgan said Ravens had too many "high-priced executives" on staff.

On January 4, 2000, Plaintiff Jones filed this action. He alleges discrimination under the ADA. On June 8, 2000, Defendant Ravens filed the instant motion for summary judgment. For its primary argument, Ravens says that Plaintiff Jones is not disabled under the Act because he is not substantially limited in a major life activity. Defendant Ravens also argues there is no evidence that Ravens regarded him as disabled or that its reason for firing Jones was pretextual. Further, Ravens says Plaintiff Jones' misrepresentations about prior salary levels bar him from reinstatement and front pay. Finally, Defendant Ravens argues there is no evidence of malice on the company's part, barring any punitive damages award.

Upon review of the briefs and relevant record evidence, the Court agrees with Defendant Ravens and grants its motion for summary judgment.

## II. LEGAL STANDARD

Fed.R.Civ.P. 56(c) states the procedure for granting summary judgment and says in pertinent part:

> [t]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

In considering a motion for summary judgment, the court must view the facts and all inferences to be drawn therefrom in the light most favorable to the non-moving party. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir.1987); *SEC v. Blavin*, 760 F.2d 706, 710 (6th Cir.1985). The moving party has the burden of showing conclusively that no genuine issue of material fact exists. *See 60 Ivy Street Corp.*, 822 F.2d at 1435.

Essentially factual disputes about matters essential to adjudication preclude the Court from granting summary judgment. *See id.* But not every factual dispute between the parties will prevent summary judgment. Rather, the disputed facts must be material. They must be facts which, under the substantive law governing the issue, might affect the outcome of the suit. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The factual dispute must also be genuine. The facts must be such that if they were proven at trial a reasonable jury could return a verdict for the non-moving party. *See id.* at 248, 106 S.Ct. 2505. The disputed issue does not have to be resolved conclusively in favor of the non-moving party, but that party is required to present some significant probative evidence which makes it necessary to resolve the parties' differing versions of the dispute at trial. *See 60 Ivy Street*, 822 F.2d at 1435 (citing *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Thus, the judge's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue a proper jury question, and not to judge the evidence and make findings of fact. "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *60 Ivy Street*, 822 F.2d at 1436 (quoting *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505).

The Court now reviews the motion and record mindful of these standards.

### III. ANALYSIS

The Americans with Disabilities Act of 1990 prohibits discrimination based upon disability or perceived disability. The ADA defines disability as a "physical or mental impairment that substantially limits one or more of [an individual's] major life activities," or being regarded as having such an impairment. 42 U.S.C. § 12101(2)(A), (C). Plaintiff Jones claims that he is substantially limited in the major life activity of working. *See* 29 C.F.R. § 1630.2(i) (defining working as a major life activity).

For purposes of its motion, Defendant Ravens challenges Jones' claim that he is substantially limited or that the company regarded Jones as being disabled. Ravens also says Plaintiff Jones' claims for reinstatement, front pay, and punitive damages under the ADA cannot stand. The Court agrees.

Defendant Ravens first contends that Plaintiff Jones is not disabled within the meaning of the ADA because he is not substantially limited in the major life activity. To support his claim, Plaintiff Jones suggests that he was limited in the major life activity of working. When a plaintiff claims to be substantially limited in the major life activity of working, "substantially limits" takes on a particular meaning:

(3) With respect to the major life activity of working—

(i) The term substantially limits means significantly restricted in the ability to perform either *a class of jobs or a broad range of jobs* in various classes as com-

pared to the average person having comparable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.

29 C.F.R. § 1630.2(j)(3).

To be protected under the ADA, Plaintiff Jones must be "precluded from more than one type of job, a specialized job, or a particular job of choice." *Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 119 S.Ct. 2139, 2151, 144 L.Ed.2d 450 (1999). Further, if jobs "utilizing an individual's skills (but perhaps not his or her unique talents) are available, one is not precluded from a substantial class of jobs." *Id.* But if "a host of different types of jobs are available, one is not precluded from a broad range of jobs." *Id.*

■ In his response to Defendant's motion, Plaintiff Jones asserts he was, "at an all times, physically capable of performing his job duties at Ravens." Federal courts have found that such a concession stops any claim that Jones is substantially limited in the major life activity of working. *See, e.g., Hilburn v. Murata Electronics North America, Inc.,* 181 F.3d 1220, 1228 (11th Cir.1999) (finding plaintiff's argument that she was substantially impaired in the major life activity of working was belied by her testimony that she was able to work); *Standard v. A.B.E.L. Services, Inc.,* 161 F.3d 1318, 1327 (11th Cir.1998) ("[The plaintiff] does not explicitly argue that his back injury significantly restricted his ability to work. In fact, he admits that he was fully capable of performing his job at all times.... Therefore, he cannot be considered disabled ...."); *Puoci v. City of Chicago,* 81 F.Supp.2d 893, 897 (N.D.Ill. 2000) ("[The plaintiff] admits, however, that he is able to perform all of the duties of his assignment, ... which undermines his argument that he is substantially limited in the life activity of working."); *id* at n. 2 ("Where a plaintiff claims that he is substantially limited in the major life activity of working, however, admitting to being

able to work does, in fact, invalidate the argument.").

Even if such a concession does not bar Plaintiff Jones' claim, there are several other reasons why plaintiff's claims fail.

■ Plaintiff Jones offers the report of Dr. Lawrence Ostrowski, a Rehabilitation Consultant. Jones maintains that the report supports a finding that his medical condition excludes him from a class of jobs or a broad range of jobs. However, the expert report suffers from multiple weaknesses.

In the report, Dr. Lawrence Ostrowski relies on a letter written by Dr. George Aromatorio, Plaintiff Jones' heart specialist. In the letter, Dr. Aromatorio summarized Plaintiff Jones' health history. Dr. Aromatorio concluded that Jones is limited in some ways and unimpaired in others:

> Physically, he does reasonably well as long as he takes his Lasix and other medications. However, his activity is significantly limited.

> \* \* \* \* \* \*

> ... I think that his ability to perform sustained physical activity is limited. However, I think that his ability to perform sedentary functions is unimpaired. I think that his prognosis will be significant[ly] improved with his current medical regimen and I have asked that he continue this.

Letter of Dr. Aromatorio, at 2.

From this letter, Dr. Ostrowski extrapolates that Plaintiff Jones is able to work only in sedentary jobs as classified in the Dictionary of Occupational Titles. Under the publications' standards, sedentary work is that which involves sitting most of the time and brief periods of walking or standing. Work that involves "exerting up to ten pounds of force occasionally ... and/or a negligible amount of force frequently ... to lift, carry, push pull, or otherwise move objects" is also considered sedentary. As Defendant Ravens points out, there are several problems with the

expert's conclusion that Plaintiff Jones was excluded from all but sedentary work.

First, there is no reason to believe that Dr. Aromatorio used the word "sedentary" in the same way an occupational specialist would. Dr. Ostrowski admitted that he assumed Dr. Aromatorio used the term in the same way he used the term.[1] But Dr. Ostrowski never spoke to Dr. Aromatorio about Plaintiff Jones' medical condition.

Second, Dr. Ostrowski also assumes that Plaintiff Jones was limited to lifting weight no greater than ten pounds on an occasional basis. But during Ostrowski's deposition, he admitted he had no basis for this conclusion:

> Q: Did you happen to notice in any of the medical information you went over whether there was a specifically denominated weight lifting restriction for Mr. Jones?
>
> A: There wasn't.

Ostrowski Dep., at 41.

Expert witness Ostrowski never asked Dr. Aromatorio whether Jones' medical condition would limit him to carrying a certain weight, walking or standing for a certain length of time, traveling, or any other factor that would help determine Jones' occupational capacity. In fact, Dr. Ostrowski noted that his conclusions about Jones' capacity were based on "Doctor Aromatorio's report and restrictions." Yet neither Dr. Aromatorio nor any other doctor ever placed restrictions on Plaintiff Jones. Dr. Ostrowski concluded Plaintiff Jones had lifting restrictions based solely on interviews with Plaintiff Jones.

Further, Plaintiff Jones' testimony casts doubt upon the conclusion that his condi-

tion is sufficiently debilitating to exclude him from all but sedentary work.

Plaintiff Jones says he suffered from some drowsiness. Jones attributes the effect to medications he took for his heart condition. However, none of the medications listed drowsiness as a side effect. In any event, even after Jones told his doctors about the drowsiness, they did not restrict any of Plaintiff's activities, including his commute of over an hour each way.

Although Plaintiff Jones requested a reduced work schedule, he discussed it in the context of his commute to work:

> Q: Can you tell me what you told Mr. Morgan as best as you can recollect and what Mr. Morgan told you?
>
> A: Well, I purely told him I was experiencing drowsiness and dizziness. I don't know if I said dizziness, but I said serious drowsiness and in driving back and forth to work. . . .

> \* \* \* \* \* \*

> Q: Did you tell him, when you mentioned here in your affidavit, you were looking for a reduced work schedule, did you tell him in detail about what you meant by that?
>
> A: No, not at all.

> \* \* \* \* \* \*

> Q: And that's the extents [sic] of the conversation . . . with Mr. Morgan?
>
> A: I don't think it lasted two-and-a-half minutes.

Jones Dep. at 82–85.

In an affidavit, Plaintiff Jones states that he requested the shorter schedule until the cardioversion procedure could be

---

1. Dr. Ostrowski's admits this assumption:
    Q: How do you know that Dr. Aromatorio, when he is referring to sedentary in his June 2d report, was using that terminology in the same fashion that you use it in your report?
    A: I don't know that.
       \* \* \* \* \* \*
    Q: When you prepared your report, did you assume that Dr. Aromatorio was using

the sedentary terminology in the same fashion that you define it in your report?
    A: Yes.
Ostrowski Dep., at 30–31.

performed. But Plaintiff Jones' deposition testimony contradicts this statement. In the deposition, there is no indication that Jones explained he needed a reduced schedule for medical reasons.[2] Mr. Morgan also stated that Plaintiff Jones linked his drowsiness to his commute, not to his health. With the more than one-hour commute each way, there is no reason for the employer to assume his drowsiness was medical rather than self-induced.

None of Jones' medications listed drowsiness as a side effect. Plaintiff Jones says his doctors told him some medications could cause drowsiness. Yet no doctors ever recommended any restrictions upon Jones' work duties or schedule. Similarly, his doctors did not restrict or recommend that he avoid the long commute to work:

Q: And did your doctors ever recommend you not commute the distances you were commuting from New castle to Akron?

A: No, they did not.

Q: Ever during the time you were working at Ravens?

A: Never. We had specific conversations about that.

Q: In other words, you told them what your commute was to Akron?

A: They were well aware of my past history and they knew—they knew what I was having to do to commute to Akron. They were well aware of the drive or my past driving history.

\*     \*     \*     \*     \*     \*

Q: ... When you told the doctors you were continuing to have these symptoms and one of them recommended cardioversion, do they say you ought not to be commuting to Ravens anymore?

A: Not to my knowledge.

Q: Even though you tell them you're having dizziness, drowsiness and the heaviness on your abdomen, they still did not stop you from driving the car from New Castle to Ravens?

A: They did not, but my recollection is they told me that I needed to be very careful, ... They never strongly insisted, but they did caution me to be careful, ... but that may have only been mentioned one time.

Jones Dep. at 71, 74–75.

Further, there is no medical support for Jones' contention that his medical condition substantially limited him from working at Ravens or any other type of work. Plaintiff Jones claims he experienced some bloating, as well as some dizziness and unsteadiness when standing up from a kneeling or squatting position. Jones says the "slight dizziness" he suffered was "nothing that caused [him a] serious problem."

Plaintiff Jones concedes that he never communicated any of his limitations to Defendant Ravens. Jones never asked to be removed from any of the tasks he says caused him problems.[3]

■ Because Plaintiff Jones testifies to only mild symptoms and his doctors failed to restrict any of his activities even after learning of his drowsiness, the Court finds

---

**2.** Plaintiff Jones does say, at different points in his deposition, that he told Lowell Morgan about his medical condition in general terms at some earlier point in time. He also says his wife spoke with Morgan, though there is no evidence what Mr. Morgan learned from this conversation. In any event, there is no evidence that at the time Jones requested the reduced schedule that Morgan would have known it was a medically-based request.

**3.** Plaintiff's deposition testimony reads, in pertinent part:
Q: You never asked to be removed of these tasks [squatting and climbing] while you were employed at Ravens?
A: Never, never.
Q: Did you ever tell Mr. Morgan that squatting or climbing was out of the picture given your medical condition?
A: I saw no purpose in doing that.
Jones Dep. at 81–82.

that Jones' impairment was not sufficiently debilitating to rise to a substantial limitation on working. *See Brookins v. Indianapolis Power & Light Co.*, 90 F.Supp.2d 993, 1002 (S.D.In.2000) (finding plaintiff was not substantially limited where doctor placed no restrictions upon him).

■ Beyond the lack of medical basis for Dr. Ostrowski's conclusions, the expert report suffers from another weakness. The Act's regulations state that several factors may be considered in determining whether an individual is substantially limited in the major life activity of working:

(A) The geographical area to which the individual has reasonable access;

(B) The job from which the individual has been disqualified because of an impairment, and the number and types of jobs utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment (class of jobs); and/or

(C) The job from which the individual has been disqualified because of an impairment, and the number and types of other jobs not utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment (broad range of jobs in various classes).

29 C.F.R. § 1630.2(j)(2).

Plaintiff Jones relies upon Dr. Ostrowski's report to show that his physical problems exclude him from performing a high percentage of available jobs in the Pittsburgh metropolitan area. The Court finds this argument unpersuasive for two reasons.

First, Dr. Ostrowski includes "medium," "heavy," and "very heavy" work in his analysis of the market. However, Ostrowski admitted that Plaintiff Jones never performed heavy or very heavy work and had not performed medium-level work in over thirty years. As a higher level executive, he showed no interest in performing

work in those categories. If Plaintiff Jones performed only light or sedentary work in the past and is now limited to sedentary work, then the relevance of including any other categories in the analysis is questionable at best. *See, e.g., McKay v. Toyota Motor Mfg., U.S.A., Inc.*, 110 F.3d 369, 373 (6th Cir.1997) ("Since plaintiff's work history ... involved only light work, and she made no showing that she ever was able to perform medium or heavy work, one is hard pressed to comprehend how she could have been regarded as a 'qualified individual' with respect to medium and heavy work.")

Second, although the report is over inclusive in the category of jobs considered, the report is under inclusive in the number of jobs to which Plaintiff Jones has access. The regulations do not require the Court to consider what jobs are available in what location. *See* 29 C.F.R. § 1630.2(j)(3)(ii) (listing factors that "may" be considered). But when geographical area is considered, that area must include "[t]he geographical area *to which the individual has reasonable access.*" *Id.* (emphasis added).

Dr. Ostrowski's expert report analyzes only the Pittsburgh metropolitan market. But Plaintiff Jones also has reasonable access to, at a minimum, markets in several Ohio cities, including Akron, Alliance, and Youngstown.

The report fails to include the range of locations to which Plaintiff Jones has proven, reasonable access. Therefore, the Court finds no genuine issue regarding Jones' alleged substantial limitation in a class or broad range of jobs. *See, e.g., Heiman v. United Parcel Service, Inc.*, 1999 WL 1179647, *4 (D.Kan. Dec. 2 1999) (finding no genuine issue where plaintiff failed to show the expert report addressed all geographical locations reasonably available).

In sum, the Court finds that Plaintiff Jones fails to support a prima facie case of disability discrimination because he fails to

show he is substantially limited in the major life activity of working.

Similarly, Plaintiff Jones fails to show that Defendant Ravens regarded him as being disabled.

When Plaintiff Jones sought a reduced schedule, he mentioned drowsiness only in the context of a discussion about his long commute. Plaintiff Jones never asked to be relieved from work duties, including the kneeling and squatting that led to his dizziness. There is no reliable evidence that Defendant Ravens knew that he had a continuing problem. Further, Defendant Ravens never took away any of Plaintiff Jones' duties. There is no evidence that anyone at Ravens ever made any statement about to Plaintiff Jones' condition.

■ In short, there is no evidence that anyone at Defendant Ravens regarded Plaintiff Jones' condition as precluding him from performing any job, let alone a class or broad range of jobs. *See Murphy v. United Parcel Service,* 527 U.S. 516, 119 S.Ct. 2133, 2138, 144 L.Ed.2d 484 (1999) ("[T]o be regarded as substantially limited in the major life activity of working, one must be regarded as precluded from more than a particular job.")

Plaintiff Jones failed to respond to Defendant's argument. Therefore, the Court finds no genuine issue of material fact on Jones' claim that Defendant Ravens regarded him as being disabled.

■ Even if Plaintiff Jones could make a prima facie case of disability discrimination, Jones fails to show that Defendant Ravens' reason for firing him was pretextual.

Jones maintains that throughout his employment, he was "underutilized." Defendant Ravens agrees. Ravens President Lowell Morgan testified that Jones was not well-matched to his position and that his strengths were in marketing, not product development. Morgan testified that the relationship was not working out and that the company was not getting the ben-

efit of Plaintiff Jones' experience. In his letter of recommendation for Jones, Morgan noted that the position "provided very little opportunity for Tom to utilize his sales and marketing talent."

Jones says Lowell Morgan told him Ravens didn't need any more high-priced executives. Taking Plaintiff's characterization as true, Morgan's explanation to Jones is consistent with Morgan's deposition testimony and the letter of recommendation. Thus far, there is no evidence that Jones' underutilization was not the real reason.

However, Plaintiff relies upon what Lowell Morgan did *after* the termination conversation to show the reason was pretextual. After firing Jones, Lowell Morgan marked in Jones' personnel record that he had resigned and that Ravens had eliminated his position.

Plaintiff Jones disputes that he resigned. He also says the position was not eliminated because Defendant Ravens hired another person to fill his position. Jones says Ravens' alleged lying about what really happened with the position is enough to raise a question about Ravens' intent. The Court disagrees.

Even if Plaintiff Jones did not resign, Morgan's recording his separation from Ravens as a resignation does not show intent to discriminate. Morgan says he called the separation a resignation rather than a termination to help Morgan gain future employment. Morgan gave a similar reason for listing the position as having been eliminated. In other words, there is no evidence that Morgan's activity was directed at protecting Plaintiff Jones, not in harming him.

Further, there is no evidence that Ravens hired another Product Development Manager. Defendant Ravens did hire an Assistant to the President a few months after firing Jones. Ravens President Lowell Morgan conceded that hierarchically, the assistant was in the same slot Plaintiff Jones was in before his termination. But there is no evidence that the newly-hired

assistant performed the same functions that Plaintiff Jones performed.

For these reasons, the Court finds no genuine issue regarding pretext.

Even if Plaintiff Ravens could show facts supporting his claim under the ADA, his own misconduct in falsely describing his past compensation during the application process with Ravens, limits the recovery available to him.

First, Plaintiff Jones is not entitled to reinstatement or front pay. Employees who have committed application fraud are not entitled to such remedies. *See McKennon v. Nashville Banner Publishing Co.,* 513 U.S. 352, 115 S.Ct. 879, 130 L.Ed.2d 852 (1995); *accord, Wehr v. Ryan's Family Steak Houses, Inc.,* 49 F.3d 1150, 1153–54 (6th Cir.1995). A defendant may raise this defense if it can show that the wrongdoing in fact occurred and that it was of such severity that the employee would have been terminated. *See Wehr,* 49 F.3d at 1154, n. 5.

Defendant Ravens notes that Plaintiff Jones admitted represent his salary at Trailstar as being approximately $25,000 a year higher than it had been. The application Jones fill out informed him that false statements might result in termination. Defendant Ravens provides an affidavit from its Human Resources Administrator indicating that Ravens has terminated employees engaging in application fraud in the past.

Plaintiff Jones fails to respond to Defendant Ravens' argument. Therefore, the Court finds no genuine issue for trial on the issue of reinstatement and front pay.

Second, Defendant Ravens argues that there is no evidence of malice supporting Plaintiff Jones' claim for punitive damages. There is minimal evidence on the record about Ravens' reaction to Jones' condition. There is no evidence that anyone at Ravens made any derogatory comments about the disabled or about insurance costs related to the disabled. When Jones told Lo-

well Morgan about his catheterization, Morgan told him to take care of his health.

Once again, Plaintiff Jones fails to respond to Defendant's argument. The Court finds no genuine issue for trial on the issue of punitive damages.

However, the issue of damages is moot because, as established above, Plaintiff Jones cannot proceed on either of his disability claims.

## IV. CONCLUSION

For the reasons stated herein, the Court grants Defendant Ravens' motion for summary judgment. Accordingly, this action is hereby terminated pursuant to Rule 58 of the Federal Rules.

IT IS SO ORDERED.