*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2000 FED App. 0093P (6th Cir.)
File Name: 00a0093p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

JAMES L. POUILLON,
    *Plaintiff-Appellant,*

*v.*

CITY OF OWOSSO; SERGEANT
SHARON LITTLE; and OFFICER
W. G. BLANCHETT,
    *Defendants-Appellees.*

No. 98-1967



Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 97-70413—Anna Diggs Taylor, District Judge.

Argued: September 23, 1999

Decided and Filed: March 16, 2000

Before: BOGGS and DAUGHTREY, Circuit Judges; and
DONALD, District Judge.[*]

———————————

[*]The Honorable Bernice B. Donald, United States District Judge for the Western District of Tennessee, sitting by designation.

1

————————————

**COUNSEL**

**ARGUED:**    Michael J. Gildner, SIMEN, FIGURA & PARKER, Flint, Michigan, for Appellant.  Marcia L. Howe, JOHNSON, ROSATI, LaBARGE, ASELTYNE & FIELD, Farmington Hills, Michigan, for Appellees.  **ON BRIEF:** Michael J. Gildner, SIMEN, FIGURA & PARKER, Flint, Michigan, for Appellant.   David R. Brinks, JOHNSON, ROSATI, LaBARGE, ASELTYNE & FIELD, Lansing, Michigan, for Appellees.

————————————

**OPINION**

————————————

   BOGGS, Circuit Judge.  James L. Pouillon was arrested by Owosso, Michigan city police while protesting on public property against abortion.   The arrest was ostensibly for "refusing a lawful police order" to move, and "obstructing passage to a public building."   Pouillon sued the City of Owosso and two of its police officers, under 42 U.S.C. § 1983, for violating his clearly established constitutional rights to freedom of speech, religion, and assembly by arresting him for protesting abortion while standing with a sign in front of city hall.  The district court denied his motion for summary judgment and, after a jury found against him, his renewed motion for judgment as a matter of law.  He appeals these rulings, and also contends that the district court committed reversible error in submitting to the jury the issue of defendants' qualified immunity, rather than submitting special interrogatories on the basis of which the court would then decide the question of whether the defendants' actions were qualifiedly immune. He also appeals the district court's dismissal sua sponte of his claim for punitive damages. The district court submitted the case to a jury under instructions that misstated and conflated the principles of qualified immunity, First Amendment rights, and freedom from arbitrary arrest.  We therefore remand this case for further

reasonable juror could have found for the nonmoving party." *Ibid.* The standard used by this court is thus "identical to the one used by the district court." *Phelps v. Yale Sec., Inc.*, 986 F.2d 1020, 1023 (6th Cir. 1993).

Because, as has been explained above, there are issues of material fact requiring jury decision, judgment as a matter of law would not be appropriate in this case. Accordingly we affirm the district court's denial of Pouillon's motions for judgment as a matter of law.

## V

Based on the record before us, we hold that the judge's instructions, properly objected to by the plaintiff, did not state the law correctly. We further hold that the record reveals a genuine issue of material fact as to the conduct of Pouillon on the day in question, and as to whether he could be constitutionally arrested for those actions. Finally, we make no determination on the question of qualified immunity, but refer the district court to the controlling Supreme Court and Sixth Circuit decisions, should a determination on qualified immunity become necessary on remand. For the foregoing reasons, we **AFFIRM** in part and **REVERSE** in part, and **REMAND** this case to the district court for further proceedings in accordance with this opinion.

proceedings under the appropriate standards, as set forth in this opinion.

## I

James Pouillon is a dedicated anti-abortion protester whose non-working life is largely devoted to activism in that cause. He was a familiar figure on the streets of Owosso, where he staged abortion protests for a portion of each day almost every weekday for over ten years. On the date he was arrested, he had decided to move his protest from his customary post on the sidewalk to a position on a small plaza separating upper and lower short flights of steps to city hall, or on the steps themselves. On the sidewalk, he had often been the target of verbal abuse as well as assorted missiles, and had once been almost run down by a motorist who swerved onto the sidewalk and drove straight at him. He had also been issued a ticket on the sidewalk by Sergeant Little on an earlier occasion for violating a city ordinance banning signs in the public right-of-way. However, Sergeant Little testified that this incident involved a large, free-standing sign rather than Pouillon's usual hand-held sign, and that it was the sign, rather than Pouillon's presence, that had constituted the sidewalk obstruction and resulted in his ticket on that earlier occasion.

On December 22, 1994, Sergeant Little and Officer Blanchett, responding to a complaint about Pouillon's presence there, went to city hall's steps and ordered him to move to the sidewalk. Pouillon contends that the reason they gave is that he was on private property and in any case was violating the doctrine of separation of church and state. They deny this and claim that they told him he was obstructing entry to and egress from city hall. In any event, when he refused to move, he was arrested under City Ordinance 19-27, which prohibits impeding a police officer in the conduct of his or her duties.

The police assert that Pouillon was actively seeking, and that he admitted that he wanted, to be arrested. Pouillon denies this. The arrest itself appears to have been handled

with some cordiality. For example, the officers moved his handcuffs from behind his back to the front of his body so that Pouillon could be more comfortable in the police cruiser; after he was taken to the police station, searched, and booked, he was released on a personal recognizance bond; Sergeant Little drove him back to his car so that he could be on time for work. Nonetheless, Pouillon charges that the police conduct was outrageous, constituted an abuse of power, and warrants punitive damages, in addition to compensatory damages for violation of his civil rights.

## II

Sergeant Little and Officer Blanchett both testified at trial that, in their judgment, Pouillon and his sign constituted an obstruction of access to city hall, or would intimidate others who might wish to use the steps. Based on this judgment, and given that they had been dispatched there due to a complaint, they asked Pouillon to move to the sidewalk. Their defense to Pouillon's charge that the arrest constituted an illegal deprivation of his First and Fourth Amendment rights is, first, that the restriction was a reasonable one since it left Pouillon alternative avenues of communication (the sidewalk), and finally, that even if his allegations on this issue were taken as true, the doctrine of qualified immunity shields them from liability.

Pouillon argues: (a) that his constitutional rights, specifically of freedom of speech, religion, assembly, and freedom from unlawful arrest, were violated, in that the officers' restriction of his freedom of speech, even if construed as a time, place, and manner regulation, was not a reasonable one; and (b) that the trial court should have rejected the defendants' qualified immunity defense and granted plaintiff's motion for judgment as a matter of law since, as he argues, there were no factual disputes permitting such a defense, in that any reasonable officer would have known that her actions involved such a constitutional violation.

## III

One further issue remained in this trial, and that is whether the manner of Pouillon's arrest, if it was not lawful, was so outrageous as to warrant punitive damages. In some cases this could hinge on contested questions of fact. Pouillon contends the district court erred in dismissing sua sponte his claim for such damages.

Dismissal by the district court sua sponte of a plaintiff's claim for exemplary damages is reviewed for abuse of discretion. *See Gordon v. Norman*, 788 F.2d 1194, 1199 (6th Cir. 1986). In the latter case, this court held that the award of punitive damages for violations of civil rights "involves an evaluation of the nature of the conduct in question, the wisdom of some form of pecuniary punishment, and the advisability of a deterrent. Therefore the infliction of such damages and the amount thereof when inflicted are of necessity within the discretion of the trier of fact." *Ibid.* As noted earlier, Pouillon's arrest was handled in a highly relaxed and cordial fashion, ending in his release on his own recognizance and his delivery, courtesy of Sergeant Little, to his own vehicle. We find that the district court did not abuse its discretion in determining that the police's conduct in this instance hardly rises to the level of egregiousness justifying punitive damages, even if it is found at trial that the arrest was unlawful and that compensatory damages are due.

## IV

Since it involves a question of law, this court reviews de novo a district court's denial of a motion for judgment as a matter of law (motion for a directed verdict), and of a renewed motion for judgment as a matter of law (motion for judgment notwithstanding the verdict). *See Moore v. Kuka Welding Systems & Robot Corp.*, 171 F.3d 1073, 1078 (6th Cir. 1999) (citing *K & T Enterprises, Inc. v. Zurich Ins. Co.*, 97 F.3d 171, 175 (6th Cir. 1996), and *Wehr v. Ryan's Family Steak Houses, Inc.*, 49 F.3d 1150, 1152 (6th Cir. 1995)). "Judgment as a matter of law is appropriate only when there is a complete absence of fact to support the verdict, so that no

was in fact content-neutral; or (b) (second jury question) he was interfering with the public use of public property, for example for such uses as access to the building. In either case, he must be afforded an ample alternative channel of communication. What constitutes such channel is a matter of law, dependent on circumstances; but (third jury question) the actions in fact taken by intervening officers, here allegedly simply ordering him to move to the nearby sidewalk, must be found by the jury to fit the legal definition, given the jury by the court, of allowing an ample alternative channel of communication.

The verdict form also asked the jury to find separately on "Plaintiff's claim of violation of his federal constitutional right to be free from unlawful arrest." But this, too, erroneously put before the jury a purely legal question. If the officers' order to Pouillon to move to the sidewalk was a reasonable one, *i.e.* if it afforded him an ample alternative channel of communication, then plaintiff's claim fails as a matter of law. If not, it succeeds, again as a matter of law. Here there is nothing for a jury to decide.

Finally, the question of qualified immunity, which was improperly submitted to the jury under general instructions, is rather a question of law for determination by the judge. Questions of fact may be relevant to this determination, *see Brandenburg v. Cureton*, 882 F.2d 211, 215-16 (6th Cir. 1989), but the ultimate question is one of law: if the finder of fact determines that the officers undertook certain actions, could any reasonable police officer have believed that those actions did not violate Pouillon's constitutional rights? *See Dominque v. Telb*, 831 F.2d 673, 676 (6th Cir. 1987) (citing *Anderson v. Creighton*, 483 U.S. 635, 664 (1987).

We hold that the district court abused its discretion in submitting to the jury questions of law as well as of fact. For this reason we reverse the district court's denial of Pouillon's motion for special interrogatories and remand this case for a new trial on the three questions which, as we have just indicated, should have been put to the jury.

Pouillon also contends that the district court committed reversible error in allowing the jury to decide the case on a general verdict that allowed a qualified immunity defense, rather than putting special interrogatories to the jury on the basis of which the court could then rule on the defendants' qualified immunity as a matter of law. A trial judge's decision whether or not to submit a dispute to the jury through special interrogatories is within the trial court's sound discretion. Fed. R. Civ. P. 49. Such discretion is reviewed by this court for abuse, which "is defined as a definite and firm conviction that the trial court committed an error of judgment." *See Monette v. AM-7-7 Baking Co.*, 929 F.2d 276, 280 (6th Cir. 1991) (quoting *Logan v. Dayton Hudson Corp.*, 865 F.2d 789, 790 (6th Cir. 1989)). The trial court's discretion will not be disturbed unless "it relies upon clearly erroneous findings of fact or when it improperly applies the law or uses an erroneous legal standard." *Fleischut v. Nixon Detroit Diesel, Inc.*, 859 F.2d 26, 30 (6th Cir. 1988).

This case involves related sets of questions for determination. First, there are three factual questions about what happened at city hall on December 22, 1994. Was Pouillon obstructing anyone? Could any reasonable officer have thought he was or might be obstructing anyone? Why did the officers arrest Pouillon? These are appropriate questions for the jury as finders of fact. Second, there are legal issues. What are the standards by which we judge whether Pouillon's actions are constitutionally protected? Did the officers' actions violate constitutional rights? These are matters on which the judge must instruct the jury.

In analyzing qualified immunity claims "[w]e conduct de novo review because the issue whether qualified immunity is applicable to an officer's actions is a matter of law." *Dickerson v. McClellan*, 101 F.3d 1151, 1157 (6th Cir. 1996). However, "[w]here . . . the legal question of qualified immunity turns upon which version of the facts one accepts, the jury, not the judge, must determine liability." *Sova v. City of Mount Pleasant*, 142 F.3d 898, 903 (6th Cir. 1998). But in either case, "[t]he first step in a qualified immunity analysis

is whether, based on the applicable law, a constitutional violation occurred." *Dickerson*, 101 F.3d at 1157.

## A

The initial question before us, therefore, is whether Pouillon had the right to protest on city hall's steps in the first place. The Supreme Court's analysis of governmental authority to regulate speech, as given in *Perry Educational Ass'n v. Perry Local Educators Ass'n*, 460 U.S. 37, 44-46 (1983), divides public property that may be used for expression by the public into several categories. The first category, and the one most open for public expression, is that of the "traditional public forum," the quintessential examples of which are public streets and parks. *Id.* at 45. In such fora, "[t]he State may . . . enforce regulations of the time, place, and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." *Ibid.* The second category includes public property which the State has designated, perhaps only for a given time, as open for use by the public for expressive activity; during the time it is so open, the same standards apply here as apply to traditional public fora. *Id.* at 45-46. Finally, some public property may be neither traditional nor designated public fora; in such venues the State may regulate speech as it wishes, so long as the regulation is reasonable and not motivated by opposition to the views thus suppressed. *Id.* at 46.

Sergeant Little's testimony indicated that she implicitly regarded the steps of city hall as belonging to the third category. That is, she drew a distinction between "City property" and "public property," asserted that the City of Owosso might flatly prohibit any protests on or near the steps of city hall, and indicated that upon a complaint from city hall she could lawfully order a protestor like Pouillon to move completely off the steps and adjoining plaza. She did not, however, know of any ordinance prohibiting such protests. She views the two sets of steps and plaza separating them as

## C

The third question is whether requiring Pouillon to move to the sidewalk was a reasonable time, place, and manner restriction that, as the First Amendment requires, left open ample alternative channels of communication. *See Perry*, 460 U.S. at 45. Under the circumstances presented here, this too involved disputed claims as to Pouillon's earlier experiences of harassment on the streets, whether ordering him to return there would inhibit his protest, as he claimed, and whether, contrary to this claim, he in fact did resume regular picketing on those sidewalks. Like the second question, whether Pouillon's actual protest impeded access, this third question also should have gone to the jury.

## D

The verdict form that was provided to the jury mixed the preceding three questions together. It asked the jury to find for either the plaintiff or the defendant on "Plaintiff's claim of violation of his federal constitutional right of free speech and assembly." The instructions amplifying this form said: "I instruct you that the government may impose and enforce reasonable time, place and manner restrictions on the exercise of the First Amendment rights. Time, place and manner restrictions may be imposed provided that they are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant government interest, and that they leave open ample alternative channels for communication." *Pouillon v. City of Owosso, et al.*, Civil Action No. 97-CV-70413-DT, Jury Trial Proceedings, at 370-71 (E.D. Mich. April 17, 1998). But the jury should not have been free to decide, for example, that Pouillon had no right to be on the steps and could be ordered off at the whim of someone from City Hall. In particular, the jury must be instructed that Pouillon had a right to demonstrate, and to be free from arrest for doing so, unless either (a) his protest was, as a matter of law, permissibly regulated by an appropriate time, place, and manner restriction of general application, and (first jury question) the application of the restriction to him

permitted in, or on the steps of, public buildings such as city hall. *See Perry*, 460 U.S. at 46. But contrary to Sergeant Little's belief, Pouillon's protest on the steps of city hall could not be prohibited altogether.

**B**

The second question is then whether Pouillon's actual protest impermissibly interfered with public use of the steps. Both Sergeant Little and Officer Blanchett testified that they felt Pouillon was impeding access to the building, and ultimately both sides agreed that this was one of the main issues upon which the legality of the officers' order turned. As the Supreme Court has recognized, protest in even the most traditionally open public fora, such as streets and parks, may be regulated to protect those areas' openness: "A group of demonstrators could not insist upon the right to cordon off a public street, or entrance to a public or private building, and allow no one to pass who did not agree to listen to their exhortations." *Cox*, 379 U.S. at 555. Given Pouillon's general right to protest on city hall's steps, the second question to be answered in determining "whether a constitutional violation occurred" in this instance is whether Pouillon's protest, in the manner it was actually being conducted, was impeding access to city hall such that it was reasonable to require him to move. This is clearly a factual question, and if in dispute it is for the jury to resolve it.

In this case the facts are indeed in dispute. A photograph of city hall's steps, with a sedate Pouillon standing on the plaza, at the foot of the upper set of steps and far to the edge of the landing, was admitted into evidence as Plaintiff's Exhibit 2. But on direct examination of its witnesses, the defense elicited testimony to the effect that this innocuous scene does not represent the reality of December 22nd, and is misleading as to whether Pouillon was potentially impeding access to the building. Here we have a classic jury issue.

nonpublic property that can be regulated at will by the property owner, i.e. the City of Owosso (presumably assuming evenhandedness and absence of animus towards a particular expression).

The issue before us is whether city hall's steps are, instead, a public forum. Insofar as this issue is a matter of law (there might also be a factual question, *e.g.*, whether a forum has been transformed into a public one by historical practice), a long line of cases concerning public fora fails to provide a definitive answer. The Supreme Court has long accorded recognition to public streets and parks as prime areas for public protest, *see, e.g., Hague v. C.I.O.*, 307 U.S. 496, 515-16 (1939). The Court has also held that a state fairgrounds is a "limited public forum" requiring comparable scrutiny of the proposed regulation of speech there. *See Heffron v. International Soc. for Krishna Consciousness*, 452 U.S. 651, 655 (1981). But when it comes to public buildings, the Court has been more reticent. In *Greer v. Spock*, 424 U.S. 828, 836 (1976), the Court took pains to point out that the fact that a government building is open to the public during specified hours, and that the public may freely enter and leave its grounds at all times, does not thereby transform that building or those grounds into a public forum. The Court cited this holding when, in *United States v. Grace*, 461 U.S. 175, 178 (1983), it invalidated a District of Columbia ordinance restricting protests in and around the Supreme Court building, but only insofar as the statute applied to the sidewalks surrounding the building. These, the Court held, were a traditional public forum which could not be restricted in this all-encompassing way. But *Grace* left intact that portion of the statute which proscribed protest on, for example, the Supreme Court steps.

This drew a dissent from Justice Marshall, who found the statute unconstitutional on its face and in its entirety, and whose citations imply that government premises are quintessential public fora afforded the strictest scrutiny for First Amendment purposes. His citation most relevant to the instant set of facts, *Edwards v. South Carolina*, 372 U.S. 232

(1963), is of a decision that had invalidated the conviction of common-law breach of the peace of protestors on the statehouse grounds in Columbia; it did not, however, do so through public forum analysis. Rather, the convictions were held to be unconstitutional because the arrests were based only on the protestors' expression of unpopular views; the fact that the arrest had been on the statehouse grounds was coincidental, although the Court noted that protesting there involved "an exercise of . . . basic constitutional rights in their most pristine and classic form." *Id.* at 235.

It would seem a considerable stretch to make *Edwards* stand for the flat proposition "that demonstrations on or near legislative grounds fall within the protection of the First Amendment," as the District of Columbia District Court did in *Jeannette Rankin Brigade v. Chief of Capitol Police*, 342 F. Supp. 575, 584 (D.D.C.), *aff'd.* 409 U.S. 972 (1972). In that case, a three-judge court heard a challenge seeking declaratory and injunctive relief from a federal statute prohibiting demonstrations on the grounds of the United States Capitol. The court held that a blanket prohibition of all assemblies and demonstrations within the traditionally accessible grounds of the national legislature, merely to preserve "the 'serenity' of a 'park-like' setting," was illegitimate. *Id.* at 585. Crucial to its reasoning was the fact that the Capitol grounds were traditionally an area of open public access, in contrast to types of public property which have been held not unrestrictedly open to the public and not, therefore, public fora for purposes of open expression: this includes such properties as jails (citing *Adderly v. Florida*, 385 U.S. 39 (1966); and libraries, schools, and hospitals (citing *Gregory v. Chicago*, 394 U.S. 111 (1969) (Black, J., concurring at 118)). *Id.* at 583. But "streets, sidewalks, parks, and other similar public places are so historically associated with the exercise of First Amendment rights that access to them for the purpose of exercising such rights cannot constitutionally *be denied broadly and absolutely* . . . ." *Ibid.* (quoting *Amalgamated Food Employees Union Local 590 v. Logan Valley Plaza, Inc.*, 391 U.S. 308, 315 (1967)) (emphasis added).

Courthouses and the area surrounding them have been held to be a special case. *Grace*, discussed *supra* at 7-8, did not overturn the decision in *Cox v. Louisiana*, 379 U.S. 559 (1965), upholding  a statute banning any demonstrations outside a courthouse that are intended to affect the outcome of a proceeding within. But that limited situation is a far cry from the city hall steps of Owosso. The latter is a venue that seems in the highest degree linked, traditionally, with the expression of opinion, comparable not to a courthouse but to a capitol building as a public forum. Numerous cases have held that the United States Capitol, as well as state capitols, are proper fora for demonstrations. *See, e.g., Pinette v. Capitol Square Review and Advisory* Bd., 30 F.3d 675 (6th Cir. 1994) (holding public square across from Ohio capitol building a public forum); *Shiel v. United States*, 515 A.2d 405 (D.C. Ct. App. 1986) (holding the Capitol Rotunda might be closed early prior to President's address there, but must be available to protestors during normal hours when open), *cert. denied*, 108 S.Ct. 1477 (1988); *Gaylor v. Thompson*, 939 F. Supp. 1363 (W.D. Wis. 1996) (Wisconsin state capitol rotunda a public forum, based on its traditional open use); *ACT-UP v. Walp*, 755 F. Supp. 1281 (M.D.Penn. 1991) (similarly, Pennsylvania capitol rotunda); *Chabad-Lubavitch of Georgia v. Harris*, 752 F. Supp. 1063 (N.D.Ga. 1990) (plaza in front of Georgia state capitol a public forum by designation).

In most of these cases, the issue is decided by reference to the history of the building's use; the record before us indicates that no one raised the question of how Owosso's city hall steps had been used in the past, whether made available to demonstrations or not. But in the absence of a showing that the steps of this public building have been traditionally restricted, we hold that the steps of Owosso's city hall are a traditional public forum, and that expression there cannot be banned absolutely. Regulation of speech in that setting is, of course, permissible within reason, just as regulation of speech on sidewalks and parks is, but such regulations will be subjected to the same strict scrutiny. Thus, "reasonable time, place, and manner regulations," if content-neutral, are