**UNITED FOOD AND COMMERCIAL WORKERS, LOCAL UNION 1099, et al., Plaintiffs,**

v.

**CITY OF SIDNEY, OHIO, et al., Defendants.**

No. C–3–00–296.

United States District Court, S.D. Ohio, Western Division.

May 2, 2001.

---

Timothy Michael Burke, Steven M. Ingram, Manley, Burke, Lipton & Cook, Cincinnati, OH, for plaintiffs.

Edward Joseph Down, Jenks, Surdyk & Cowdry Co., LPA, Dayton, OH, for defendants.

Micholas Edward Subashi, Brian L. Wildermuth, Law Office of Nicholas E. Subashi, Dayton, OH, for Sidney City Schools and Steve Miller.

Michael Fay Boller, Kerrigan, Boller & Stevenson, Sidney, OH, for Mark Schemmel.

Jeffrey S. Sutton, Chad A. Readler, Jones, Day, Reavis & Pogue, Columbus, OH, for Wal-Mart Stores Inc.

DECISION AND ENTRY SUSTAINING THE MOTION OF DEFENDANTS SIDNEY CITY SCHOOLS AND STEVE MILLER (IN HIS OFFICIAL CAPACITY) TO DISMISS (DOC. #8); MOTION OF DEFENDANT STEVE MILLER TO DISMISS CLAIMS AGAINST HIM IN HIS INDIVIDUAL CAPACITY (DOC #8) OVERRULED AS MOTT; PLAINTIFFS ARE GRANTED LEAVE TO FILE AMENDED COMPLAINT, WITHIN TWENTY (20) DAYS FROM DATE, SUBJECT TO THE STRICTURES OF RULE 11, SETTING FORTH ALLEGATIONS THAT SIDNEY CITY SCHOOLS HAS, BY POLICY OR PRACTICE, DESIGNATED SCHOOL PROPERTY AS A PUBLIC FORUM, FOR THE PURPOSE OF CAMPAIGNING AND OTHER EXPRESSIVE ACTIVITIES, ON DAYS WHEN THE SCHOOL IS BEING USED AS A POLLING PLACE

RICE, Chief Judge.

This litigation arises out of the Defendants' alleged refusal to allow the Plaintiffs to solicit signatures at various polling places, located primarily on public school property, and the Defendants' alleged attempts to thwart Plaintiffs' referendum efforts through the use of unlawful legislative conduct. Plaintiffs Judy Bishop ("Bishop"), Doug Burgstaller ("Burgstaller"), Jeff Crider ("Crider"), Ray Evans, III ("Evans"), Bonnie France ("France"), Chad Helmlinger, Leah Helmlinger, Tonya McCoy ("McCoy"), Bryon O'Neal ("O'Neal"), Jeff Osting ("Osting"), Keith Robinson ("Robinson"), and Jessica Sagraves ("Sagraves") are members of Plaintiff United Food and Commercial Workers Local Union 1099 ("UFCW").[1]

Pending before the Court is the Motion of Defendants Sidney City Schools and Steve Miller to Dismiss, pursuant to Fed. R.Civ.P. 12(b)(6) (Doc. # 8). As a means of analysis, the Court will first set forth the factual circumstances giving rise to this litigation and the standard governing Defendants' Motion, and then will turn to the parties' arguments. For the reasons assigned, Defendants' Motion is SUSTAINED.

I. *Factual Background*[2]

On February 28, 2000, the City Council of Sidney, Ohio, enacted Ordinance No. A–2203, which effected the rezoning of Lots 5918 and 6180 from an I–2 Heavy Industrial District to a B–2 Community Business District. The apparent effect of the ordinance was to allow the expansion or the construction of a Wal–Mart store at that location. On March 2, 2000, Plaintiffs submitted a certified copy of that ordinance and a pre-circulation referendum petition to the City of Sidney, seeking a referen-

---

1. UFCW is a labor union consisting of approximately 18,000 members in southwest and west central Ohio, northern Kentucky, and southeast Indiana.

2. The following facts are derived from Plaintiffs' Complaint (Doc. # 1).

dum on Ordinance No. A–2203.[3] On March 7, 2000, the day of the primary election in Ohio, the individual Plaintiffs solicited signatures for the referendum petition from voters outside of polling places in Sidney, Ohio. At issue are Plaintiffs' attempts to solicit signatures on the property of four Sidney public schools, namely Parkwood Elementary School, Emerson Elementary School, Whittier Elementary School, and Lowell Elementary School, as well as at the Sidney–Shelby County Y.M.C.A. and the Trinity Church of the Brethren.

The factual circumstances at each of these polling sites is substantially similar. A few of the individual Plaintiffs attempted to collect signatures from voters.[4] They acted in a peaceful and non-disruptive manner, and neither interfered with the operations of the facilities nor hindered public access to the polling place. At all times, Plaintiffs remained outside the area marked by two small United States flags, which had been placed outside of the polling place, within which area "electioneering" was not to take place. After soliciting signatures for a period of time, the property owner requested that the Plaintiffs relocate. Soon thereafter, a police officer or a deputy from the Shelby County Sheriff's Office was called to the location, and Plaintiffs were ordered to leave the premises, under threat of arrest for trespassing on private property. Rather than face arrest, each of the Plaintiffs complied with the deputy's request. Plaintiffs allege that the efforts to prevent them from soliciting signatures for the referendum petition out-

side of polling places was encouraged and orchestrated by the City of Sidney and, in particular, by Michael Puckett ("Puckett"), the City Manager.

In response to Plaintiffs' referendum efforts on March 7th, the Mayor of Sidney instructed Puckett to draft a "counter-petition" form to facilitate the removal of signatures from the referendum petition. The counter-petition forms were available at the City Clerk's office for members of the public to sign. In addition, Puckett provided blank copies of the counter-petition directly to Wal–Mart, and asked the company to provide a place in the lobby of its existing Sidney store for the public to sign. Wal–Mart complied with that request.

On March 23, 2000, Puckett presented the referendum petition, the counter-petition, and a list of nineteen individuals, who had contacted the City and purportedly asked to have their names removed from the petition, to the Shelby County Board of Elections. The Board of Elections referred the issue of the validity of the counter-petition to the office of the Ohio Secretary of State.

On April 3, 2000, the Sidney City Council held a special meeting, for the purpose of circumventing the referendum. At that meeting, the City Council adopted Ordinance No. A–2207, which repealed Ordinance No. A–2203. Thereafter, the City Council adopted Ordinance No. A–2208, which rezoned lots 5918 and 6180 from an I–2 Heavy Industrial District to a B–2

3. Under the Sidney Code of Ordinances, petitions for referendums must be filed within two weeks following the passage of the ordinance called into question (Compl. Ex. 1: Sidney Ord. § 9–4).

4. Bishop, Evans, and Sagraves attempted to collect signatures at Parkwood Elementary School. Young and O'Neal were located at

Emerson Elementary School. Robinson and McCoy solicited signatures at Whittier Elementary School. The Helmlingers attempted to collect signatures at Lowell Elementary School. Osting, Crider and Osting's son attempted to collect signatures at the Y.M.C.A. Brugstaller and France were located at Trinity Church.

Community Business District, in exactly the same manner as had Ordinance No. A–2203. Both Ordinance No. A–2207 and A–2208 were passed as emergency measures, pursuant to Sidney Code of Ordinances § 3–14, which permits the City Council to adopt an emergency ordinance that takes effect upon passage. Plaintiffs allege that the City Council's adoption of Ordinance Nos. A–2207 and A–2208 violated a number of legislative requirements. In particular, Plaintiffs allege that Councilwoman Doris Blackston was a Wal–Mart employee, creating a conflict of interest, yet she actively participated in the presentation and passage of the ordinances. They further allege that Ordinances Nos. A–2207 and A–2208 were not valid emergency measures, and that they circumvented the process for zoning changes, set forth in Sidney Code of Ordinances Chapter 1153.

On April 17, 2000, the Shelby County Board of Elections informed the City of Sidney that the counter-petition was invalid and that no signatures would be removed from the referendum petition on that basis. After a review of the referendum petition, the Board of Elections concluded that there were 525 valid signatures and 283 invalid signatures, a sufficient amount to place the referendum on the November, 2000, ballot.[5] Plaintiffs allege that the repeal of Ordinance No. A–2203 by Ordinance No. A–2207 was performed in order to render the referendum petition moot.

On June 13, 2000, Plaintiffs initiated this litigation against the City of Sidney; Sidney City Schools; the Shelby County Sheriff's Office; Puckett; Steven P. Wearly, the Chief of Police of the Sidney Police Department; Steve Miller, Superintendent of Sidney City Schools; Mark Schemmel, Shelby County Sheriff; Greg Franks, Manager of the Sidney Wal–Mart store; John Waters, District Manager for Wal–Mart Stores, Inc.; and Wal–Mart Stores, Inc (Doc. # 1).[6] Plaintiffs have since voluntarily dismissed, without prejudice, their claims against the three Wal–Mart Defendants, the Shelby County Sheriff's Office, and Defendant Steve Miller, in his individual capacity only (Doc. # 5, Doc. # 15).

In their Complaint, Plaintiffs set forth two claims for relief. In Count One, Plaintiffs allege that Defendants have deprived them of their rights, under the First and Fourteenth Amendments to the United States Constitution, to freedom of expression, freedom of assembly, and freedom to petition the government for redress, in violation of 42 U.S.C. § 1983, by preventing them from soliciting signatures outside of the areas demarcated by flags at public polling places. In Count Two, they further allege that Defendants City of Sidney, Puckett, Waters, and Wal–Mart have conspired, in violation of 42 U.S.C. § 1985: 1) to prevent them from engaging in their right to obtain signatures for a referendum petition, 2) to introduce an improper and misleading "counter-petition" in an attempt to influence the Board of Elections' decision-making process, and 3) to circumvent Plaintiff's right to a referendum through a pattern of unlawful legislative conduct.

## II. Standard Governing Rule 12(b)(6) Motions

When considering a motion to dismiss pursuant to Rule 12(b)(6), the court must "construe the complaint in the light most favorable to the plaintiff, accept all factual

---

5. Plaintiffs indicate that only 459 signatures were required to place the referendum on the November, 2000, ballot.

6. Each of the individual Defendants had been sued in both their official and individual capacities.

allegations as true, and determine whether the plaintiff undoubtedly can prove no set of facts in support of his claims that would entitle him to relief." *Cline v. Rogers,* 87 F.3d 176, 179 (6th Cir.) (citing *In re DeLorean Motor Co.,* 991 F.2d 1236, 1240 (6th Cir.1993), *cert. denied,* 519 U.S. 1008, 117 S.Ct. 510, 136 L.Ed.2d 400 (1996)); *see also Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Barrett v. Harrington,* 130 F.3d 246 (6th Cir.1997), *cert. denied,* 523 U.S. 1075, 118 S.Ct. 1517, 140 L.Ed.2d 670 (1998) ("In considering a motion to dismiss for failure to state a claim, the Court is required to take as true all factual allegations in the complaint."); *Lamb v. Phillip Morris, Inc.,* 915 F.2d 1024, 1025 (6th Cir.1990), *cert. denied,* 498 U.S. 1086, 111 S.Ct. 961, 112 L.Ed.2d 1048 (1991). However, the Court need not accept as true a legal conclusion couched as a factual allegation. *Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986). A well-pleaded allegation is one that alleges specific facts and does not merely rely upon conclusory statements. The Court is to dismiss the complaint "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984).

### III. Motion of Defendants Sidney City Schools and Steve Miller to Dismiss (Doc. # 8)

Defendants Sidney City Schools and Superintendent Miller contend that Plaintiffs' § 1983 claims against them, which are based on the decision not to permit Plaintiffs to collect signatures on school property, must be dismissed. Sidney City Schools argues that its public schools are not public forums, and the fact that polling places were located on school property did not render them such public forums on March 7, 2000. The school district further argues that, absent such a decision to create a public forum, Plaintiffs had no First Amendment right to engage in expressive activities at any of the elementary schools listed in their Complaint.[7] Defendant Miller argues he is entitled to qualified immunity for the claims against him in his individual capacity and, therefore, those claims must also be dismissed. Because Plaintiffs have previously dismissed their claims against Miller in his individual capacity, Miller's Motion to Dismiss Plaintiffs' Complaint against him in that capacity is OVERRULED as MOOT. Because Plaintiffs' claims against Miller in his official capacity must also be dismissed,[8] the

7. Defendants do not dispute Plaintiffs' contention that their speaking with voters and soliciting signatures for their referendum petition constitutes political speech, which is afforded the highest degree of constitutional protection.

8. It is well-settled that a claim against an officer or employee of a governmental entity, in his or her official capacity, is a claim against the governmental entity itself. *Will v. Michigan Dept. of State Police,* 491 U.S. 58, 67, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989); *Kentucky v. Graham,* 473 U.S. 159, 166–67, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985) (If a defendant is sued in his official capacity, the suit "is, in all respects other than name, to be treated as a suit against the [state or munici-

pal] entity."); *Leach v. Shelby County Sheriff,* 891 F.2d 1241, 1245–46 (6th Cir.1989), *cert. denied,* 495 U.S. 932, 110 S.Ct. 2173, 109 L.Ed.2d 502 (1990) (A § 1983 action "against a defendant 'in his official capacity' is equivalent to a suit against the local government entity."). Because Miller has been sued in his official capacity, the lawsuit is, in essence, against the municipality, namely Sidney City Schools. Since this municipal entity has been named as a Defendant in this litigation, Miller is entitled to dismissal of Plaintiffs' claims against him in his official capacity. *Soliday v. Miami County, Ohio,* 1993 WL 1377511 *6 (S.D.Ohio Nov.11, 1993) (Rice, J.).

Court will address only the issues raised by Sidney City Schools.

■ The Supreme Court has divided public property that may be used for expression into three general categories of forums: the traditional public forum, the designated public forum, and the nonpublic forum. *Cornelius v. NAACP Legal Defense & Ed. Fund, Inc.*, 473 U.S. 788, 802, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985); *Arkansas Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 677, 118 S.Ct. 1633, 140 L.Ed.2d 875 (1998); *Pouillon v. City of Owosso*, 206 F.3d 711, 715 (6th Cir. 2000). "Traditional public [forums] are defined by the objective characteristics of the property, such as whether, 'by long tradition or by government fiat,' the property has been 'devoted to assembly and debate.'" *Arkansas Educ. Television Comm'n*, 523 U.S. at 677, 118 S.Ct. 1633, quoting *Perry Ed. Assn. v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983). Such locations include public parks, streets, and sidewalks. *Perry*, 460 U.S. at 45, 103 S.Ct. 948; *Pouillon*, 206 F.3d at 715. In these forums, "[t]he State may ... enforce regulations of the time, place, and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." *Id.* The government can exclude a speaker from a traditional public forum "only when the exclusion is necessary to serve a compelling state interest and the exclusion is narrowly drawn to achieve that interest." *Cornelius*, 473 U.S. at 800, 105 S.Ct. 3439.

■ Designated public forums, in contrast, are created by purposeful governmental action. "The government does not create a [designated] public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional public forum for public discourse." *Cornelius*, 473 U.S. at 802, 105 S.Ct. 3439. Hence, "the Court has looked to the policy and practice of the government to ascertain whether it intended to designate a place not traditionally open to assembly and debate as a public forum." *Id.* The government may open a facility either for indiscriminate use by the general public, or it may open it to a limited segment of the public, thus creating a limited-purpose designated public forum. During the time that the property is so open, the same standards apply here as apply to traditional public forums. *Pouillon*, 206 F.3d at 715, citing *Perry, supra.*

■ Government property that does not fall into either public forum category is either a nonpublic forum or not a forum at all. The government can restrict access to a nonpublic forum "as long as the restrictions are reasonable and [are] not an effort to suppress expression merely because public officials oppose the speaker's view." *Arkansas Educ.*, 523 U.S. at 677–78, 118 S.Ct. 1633, quoting *Cornelius*, 473 U.S. at 800, 105 S.Ct. 3439.

■ With regard to public schools, the Supreme Court has recognized that public schools do not possess all of the attributes of streets, parks, and other traditional public forums that "time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 267, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988), quoting *Hague v. CIO*, 307 U.S. 496, 515, 59 S.Ct. 954, 83 L.Ed. 1423 (1939). Consequently, school facilities may be deemed to be public forums *only if* school authorities have "by policy or by practice" opened those facilities for general or limited use by the public. *Perry*, 460 U.S. at 47, 103 S.Ct. 948. If the facilities have not been so designated, then no public forum has

been created, and school officials may impose reasonable restrictions on the speech of students, teachers, and other members of the school community. *Id.* at 46, n. 7, 103 S.Ct. 948.

Plaintiffs assert that the public schools at issue herein were operating not only as schools, but as polling places for the Presidential primary election. They contend that polling places and the area immediately surrounding them are "quintessential public forums." (Doc. # 16 at 12, *citing, e.g., Burson v. Freeman,* 504 U.S. 191, 196–98, 112 S.Ct. 1846, 119 L.Ed.2d 5 (1992) and *Dorn v. Board of Trustees of Billings Sch. Dist.,* 203 Mont. 136, 661 P.2d 426 (1983)). They further contend that the Ohio legislature, by enacting legislation which creates "campaign-free zones" around polling places, has implied and has established that citizens have a right to exercise their right to free speech immediately adjacent to those zones. Plaintiffs further argue that this Court must make a detailed factual inquiry into whether Sidney City Schools designated either all or a portion of its schools as public forums when the schools were used as polling sites. They contend that they have alleged sufficient facts to support the conclusion that Sidney City Schools created, by contract, designated public forums at the schools in which polls were located.

## A. *Traditional public forum*

■ The arguments set forth by Plaintiffs and Defendants regarding whether Plaintiffs had attempted to collect signatures at public forums are akin to a discussion of whether a glass is half empty or half full. Plaintiffs focus on the fact that the schools were polling sites. Defendants emphasize that the polling sites were schools. The parties recognize that public schools, in general, are not public forums, and that school facilities may be deemed to

be public forums *only if* school authorities have "by policy or by practice" opened those facilities for general or limited use by the public. However, Plaintiffs have cited to a number of cases which state, without discussion of the nature of the real property upon which the polls are located, that the area around the polls is a traditional public forum, because such areas have been the site of campaigning, exit polling, and newspaper interviews.

Upon reading relevant case law, the Court concludes that polling places and the areas which surround them are *not* automatically traditional public forums. In *Burson, supra,* the Supreme Court stated that the Tennessee statute at issue, which prohibited campaigning within 100 feet of the polls, "bar[red] speech in quintessential public forums." 504 U.S. at 196–97, 112 S.Ct. 1846. However, the Court immediately thereafter noted that testimony at trial established that, at some Tennessee polling locations, the campaign-free zone included sidewalks and streets adjacent to the polling places. 504 U.S. at 196, n. 2, 112 S.Ct. 1846. Sidewalks and streets continued to be recognized as traditional public forums under *Burson.* Thus, the Supreme Court did *not* conclude that *all* of the area surrounding the polls constituted a public forum, regardless of the property on which it was located. In *The Daily Herald Co. v. Munro,* 838 F.2d 380 (9th Cir.1988), cited by Plaintiffs, the court similarly stated: "The *public areas* within 300 feet of the entrance to the polling place are traditional public forums[,] because they traditionally are open to the public for expressive purposes, including random interviews by reporters, *and encompass streets and sidewalks.*" 838 F.2d at 384 (emphasis added). By this statement, the Ninth Circuit does not appear to endorse Plaintiffs' argument that *all* of the area within a given number of feet is, without question, a public forum. Rather, like the

Supreme Court, the Ninth Circuit has expressed that the *public* areas near the polls, such as streets and sidewalks, have traditionally been the site of expressive activities. In light of the facts that the polling places at issue herein are located within public schools, which are not traditional public forums, and that the Court has found no case law to support the argument that non-public areas surrounding polls are rendered public forums, solely by virtue of the presence of the polls on the site, the Court concludes that the Sidney public school property on which polling places were located are not traditional public forums.

## B. *Designated Public Forum*

The parties agree that at least a portion of the school property at issue herein was designated as a limited public forum. They dispute, however, which portions of the school property were so designated and the degree to which that property was made a public forum. Plaintiffs argue that the location of the polling site in a public school transforms the school into a general-purpose public forum, upon which they had a constitutional right to solicit petitions for their referendum. In support of that argument, Plaintiffs rely primarily on *Dorn, supra.* In that case, Dorn contacted an elementary school, which was being

---

9. In *Grayned,* the Supreme Court held that an anti-noise ordinance which prohibited individuals from willfully making a noise or diversion that disturbs or tends to disturb the peace or good order of a school, while school was in session, was not unconstitutionally vague or overbroad. Rather, the ordinance was a reasonable time, place, or manner restriction on the plaintiff's First Amendment rights.

10. In *Tinker,* the Supreme Court addressed the constitutionality of a school policy of suspending students who refused to remove armbands worn to protest the Vietnam War. The Court struck down the policy, stating that

used as a polling place during the November, 1981, general election, to inform school officials that he intended to collect signatures on an initiative petition inside the school on election day. Although the school district did not restrict individuals from soliciting signatures on the grounds adjacent to the school buildings, it had a written policy prohibiting solicitation inside school buildings. Accordingly, the school district denied Dorn permission to enter the school on election day to collect signatures. On that day, Dorn entered the school building, despite the school principal's objections. The principal asked Dorn to leave the building, and when he refused, the principal contacted the police to have him ejected. Under threat of arrest, Dorn left the building.

Dorn then filed suit in Montana state court, arguing, *inter alia,* that he had a constitutionally protected right to exercise his First Amendment rights in school buildings being used as polling places. The Montana Supreme Court agreed with the plaintiff that the school's policy violated his First Amendment rights, relying primarily on *Grayned v. City of Rockford,* 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972),[9] and *Tinker v. Des Moines Indep. Community Sch. Dist.,* 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969).[10] It reasoned:

"[i]n order for the State in the person of school officials to justify prohibition of a particular expression of opinion, it must be able to show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." 393 U.S. at 738, 89 S.Ct. 817. Because the record did not "demonstrate any facts which might reasonably have led school authorities to forecast substantial disruption of or material interference with school activities, and no disturbances or disorders on the school premises in fact occurred," *id.* at 740, 89 S.Ct. 817, the

In the context of a school environment, incompatible expression must be found in substantial disruption of or material interference with normal school activities, *Grayned,* 408 U.S. at 118, 92 S.Ct. at 2304; "undifferentiated fear or apprehension of disturbance is not enough to overcome the right of freedom of expression". *Tinker,* 393 U.S. at 508, 89 S.Ct. at 737. Moreover, a decision as to whether a manner of expression is incompatible, must be on an individual basis, given a particular fact situation, *Grayned,* 408 U.S. at 119, 92 S.Ct. at 2305, and not by means of broad classifications, especially those based on subject matter. *Mosley,* 408 U.S. at 101, 92 S.Ct. at 2293; *see,* also, *Consolidated Edison Co. v. Public Service Commission* (1980) 447 U.S. 530, 100 S.Ct. 2326, 65 L.Ed.2d 319. Finally, to be permissible, any regulation of expressive activities must be the least restrictive means of furthering the state's interest in providing a school environment conducive to student's learning, *Grayned, supra.*

The policy prohibiting appellant's solicitation activities is not premised on any actual instances in which indoor or outdoor solicitation activities have either substantially disrupted, or threatened to substantially disrupt, normal school activities. From the stipulated facts, the most that can be said regarding the incompatibility of solicitation activities and school functioning is that the hallways might be noisier or more congested while solicitors converse with registered voters regarding the contents and merits of a particular initiative petition. That is not analogous to making a speech in the reading room of a library, which is how the United States Supreme Court illustrated the incompatibility test it articulated in *Grayned.* Furthermore,

the record is devoid of any facts to substantiate the school district's security concern.

Finally the school district's policy is not narrowly tailored to further its interests in undisrupted school functioning. Less restrictive means of achieving the objective were not tried.

Unlike the ordinance upheld in *Grayned,* the school district's policy applies throughout the day, irrespective of whether or not classes are in session, and reaches all solicitors, irrespective of whether or not they conduct their activities peaceably. Like the ordinance struck down by *Mosley,* the school district's policy selectively excludes solicitation on the basis of subject matter and undifferentiated fear of disruption.

In its present form the school district's policy unnecessarily infringes on the First Amendment liberties of appellant and the class he represents. Therefore, the District Court's order is reversed and the school district's policy is hereby declared to be unconstitutional. 661 P.2d at 433.

Defendants counter that the placement of the polls on school property merely granted voters limited access to the school, namely permission to park, to walk to the polls inside the school, and to cast their votes therein. They assert that Sidney City Schools did not, by using public schools as polling places, grant the general public the right to engage in expressive activities, other than voting. In their reply memorandum, Defendants cite extensively to the Eighth Circuit's recent decision in *Embry v. Lewis,* 215 F.3d 884 (8th Cir.2000). In *Embry,* two citizens, Delamater and Embry, entered school grounds for the purpose of collecting signatures for an initiative petition drive, which sought to

Court held that the school regulation was     unconstitutional.

put a measure on a future ballot allowing local governments to restrict highway billboards. A special election was being held that day, and the school was a designated polling place. Delamater set up a table and chair on the grass on the west side of the school property near, but not upon, the public sidewalk. This location was more than 25 feet away from the school's polling entrance, as required by Missouri law. The school principal approached Delamater, and asked him if he had permission to be on school grounds. When Delamater stated that he did not have such permission, the principal consulted with the school superintendent, who indicated that the principal had the authority to make the final determination about Delamater's presence. The principal then asked Delamater to leave the property, and he complied.

Later, after speaking with Delamater, Embry returned to the school and set up her table on school property near, but not upon, the sidewalk. As with Delamater, the principal approached Embry and requested that she leave the premises. When Embry stated that she had a right to collect signatures at the school, because it was a polling place, and indicated that she would not leave, the principal contacted the Police Chief. Embry was arrested when she refused to leave the school grounds. Embry and Delamater subsequently filed a claim under § 1983 against the principal, the superintendent and the police chief, alleging a violation of their First Amendment rights.

The plaintiffs argued to the Eighth Circuit that petition circulation is core politi-

cal speech, which is protected by the First Amendment. They further asserted that the district court had erred in concluding that the school, as a whole, was a nonpublic forum. They argued that their electioneering activities were permitted at the school on that day, according to Missouri law, provided that they remained at least 25 feet away from the polling entrance. The *Embry* court rejected the plaintiffs' contentions, reasoning:

The Adams Middle School building was designated as a polling place under Missouri law, and the voting booths were located on the first floor of the school building near the west entrance. Only a portion of the school property was a designated public forum on November 4, 1997, for the limited purpose of voting, in accordance with § 115.117.[11] Specifically, this area included the parking lot, the walkway leading to the west entrance, the hallway inside the school leading to the voting booths, and the area containing the voting booths. All other areas of the school property, however, remained a nonpublic forum. Neither Embry nor Delamater were located on those portions of the school property which had been appropriated for election purposes.

Public schools are not deemed public forums unless the "school authorities have 'by policy or by practice' opened those facilities 'for indiscriminate use by the general public.'" Government ownership of the school property does not automatically open that property to the public. There is no evidence in the record that the school officials opened up the school for "indiscriminate use by the

11. Mo.Rev.Stat. § 115.117(1) states:
The election authority may designate tax-supported public buildings or buildings owned by any political subdivision or special district to be used as polling places for any election, and no official in charge or

control of any such public building shall refuse to permit the use of the building for election purposes. The election authority shall have the right to choose the location of the polling place within such buildings.

general public." In fact, it was the state of Missouri, not the school officials, that opened a portion of the school to registered voters for the limited purpose of voting. This action by the state of Missouri, pursuant to § 115.117, did not turn the rest of the school property into a designated public forum.

... Despite the designation of the school building as a polling place on November 4, 1997, the balance of the school property remained a nonpublic forum, except for those portions of the school that were necessarily opened for voting purposes. The grassy area on the school property where Embry and Delamater set up a table for petitioning was not open to the public regardless of the number of feet it was located from the west entrance....

215 F.3d at 888–89. Having concluded that the plaintiffs were not located on a public forum, the court noted that "[a]ccess to a nonpublic forum can be restricted, provided the restrictions are reasonable and are not an effort to suppress opposing viewpoints." *Id.* at 889. It concluded that the decision to exclude Embry and Delamater from the school property was reasonable, because school officials have broad discretion to restrict visitors to school property in order to protect the safety and welfare of the school children.

■ Upon review of the case law, the Court concludes that the view expressed by the *Dorn* court is unpersuasive, and that *Embry* presents the better approach. The *Dorn* court assumed, without any analysis, that the school constituted a public forum. Having made that assumption, it jumped to an analysis of the extent to which the government could restrict speech on school property. Moreover, the Court agrees with Defendants that the *Dorn* court misapplied Supreme Court precedent. The *Grayned* case, relied upon

in *Dorn*, addressed the constitutionality of a restriction on speech on *public* sidewalks (*i.e.*, traditional public forums) located near a school. There is no discussion of the rights of protestors or, in this case, individuals collecting signatures for a petition to do so *on school grounds*. In addition, the Court does not find the above quoted language in *Tinker* to be dispositive of Plaintiffs' rights herein. The *Tinker* case addressed the First Amendment rights of *students* while they are attending school. *Tinker* does not hold that a school is a public forum, such that the government may not restrict speech on school grounds by the *public at large*, in the absence of facts which might reasonably have led school authorities to forecast substantial disruption of or material interference with school activities. Accordingly, the Court finds no basis for the *Dorn* court's conclusion that the plaintiffs had a right to collect petition signatures on school property, in the absence of actual instances in which solicitation activities have either substantially disrupted, or threatened to substantially disrupt, normal school activities.

The *Embry* court, on the other hand, began its forum analysis with the acknowledgment that schools are not deemed public forums unless they have been designated as such by school officials, pursuant to a policy or practice. Recognizing that the school had been opened to the public on election days by statute, the court based its forum analysis on the scope of the statute, § 115.117. That statute required school officials to permit the use of school buildings "for election purposes." The Eighth Circuit interpreted that section as stating that a portion of the school was opened to *registered voters* for the limited purpose of *voting*. The court gave *no* indication that it had considered the school to be open to the public for any election purpose other than voting (such as distribution of campaign literature, exit polling,

interviewing, or solicitation of signatures for a future initiative or referendum).

In Ohio, the designation of school buildings as polling places is also required by statute. Ohio Rev.Code § 3501.29 states, in pertinent part:

The board of elections shall provide for each precinct a polling place and provide adequate facilities at each polling place for conducting the election ... The board shall utilize, in so far as practicable, rooms in public schools and other public buildings for polling places. Upon application of the board of elections, the authority which has the control of any building or grounds supported by taxation under the laws of this state, shall make available the necessary space therein for the purpose of holding elections and adequate space for the storage of voting machines, without charge for the use thereof. . . .

Ohio Rev.Code § 3501.29(A). Although the legislature did not define the exact contours of the phrase "purpose of holding elections", § 3501.29 does not create a general purpose designated public forum. A reading of the statutory language indicates an intent to open a portion of public school property to registered voters for the limited purpose of voting, not for other expressive activities which may accompany elections. While the Court recognizes that exit polling, distributing campaign literature, protesting, collecting signatures for initiatives or referenda, and interviewing commonly occur near polling places, those activities are not necessary for "holding elections." Accordingly, the Court concludes that, through § 3051.29, the Ohio legislature has created only a limited designated public forum, allowing the use of limited areas within its public schools as polling places at which registered voters may vote.[12] Accordingly, § 3501.29 does not provide Plaintiffs a constitutional right to solicit signatures on school grounds, while that building is being used as a polling place.

■ Plaintiffs further argue that other Ohio statutes have implied that all of the areas outside of the campaign-free zone are available for election activities. Specifically, they cite to Ohio Rev.Code §§ 3501.30 and 3501.35, which provide, in pertinent part:

The board of elections shall provide for each polling place the necessary ballot boxes, official ballots, cards of instructions, registration forms, pollbooks, or poll lists, tally sheets, forms on which to make summary statements, writing implements, paper, and all other supplies necessary for casting and counting the ballots and recording the results of the voting at such polling place ... Such supplies shall also include a flag of the United States approximately two and one-half feet in length along the top, which shall be displayed outside the entrance to the polling place during the time it is open for voting. Two or more small flags of the United States approximately fifteen inches in length along the top shall be provided and shall be placed at a distance of one hundred feet from the polling place on the thoroughfares or walkways leading to the polling place, to mark the distance within which persons other than election officials, witnesses, challengers, police officers, and electors waiting to mark, marking, or casting

12. This Court agrees with the *Embry* court that the area designated for the purpose of holding elections includes the parking lot, the walkway leading to the school entrance closest to the polls, the hallway inside the school leading to the voting booths, and the area containing the voting booths. The remaining portions of the school property remain a non-public forum.

their ballots shall not loiter, congregate, or engage in any kind of election campaigning. Where small flags cannot reasonably be placed one hundred feet from the polling place, the presiding election judge shall place the flags as near to one hundred feet from the entrance to the polling place as is physically possible.... (Ohio Rev.Code § 3501.30)

During an election and the counting of the ballots, no person shall loiter or congregate within the area between the polling place and the small flags of the United States placed on the thoroughfares and walkways leading to the polling place; in any manner hinder or delay an elector in reaching or leaving the place fixed for casting his ballot; within such distance give, tender, or exhibit any ballot or ticket to any person other than his own ballot to the judge of election; exhibit any ticket or ballot which he intends to cast; or solicit or in any manner attempt to influence any elector in casting his vote.... (Ohio Rev.Code § 3501.35)

A similar argument was addressed and rejected by the *Embry* court. Upon reviewing Mo.Rev.Stat. § 115.637(18), which requires individuals to remain at least 25 feet away from the entrance to the polling place, that court reasoned: "Although Missouri law makes it an offense to electioneer within 25 feet of a polling place's outer door, it does not automatically follow that electioneering is allowed anywhere outside the 25 foot line." 215 F.3d at 888–89. This Court agrees. Upon review of relevant case law, the Court has found no basis to conclude that the establishment of a campaign-free zone simultaneously creates a guaranteed right to engage in campaigning and other expressive activities beyond the flags, regardless of the type of forum. Accordingly, the Court concludes that Ohio Rev.Code §§ 3501.30 and 3501.35 do not operate to designate school

property beyond the United States flags as a public forum. Plaintiffs cannot rely on those statutes to support their argument that they had a First Amendment right to solicit signatures on school property beyond the flags.

Plaintiffs have further argued that the extent to which school officials have designated school property as a public forum is a question of fact, not of law. As stated above, school officials may open up a school to the public for expressive uses through policies and practices. In their Complaint, Plaintiffs do not allege any facts to support the conclusion that school officials designated any portion of the school property at issue as a public forum, for the purpose of electioneering and other expressive activities, through any policies or practices. In addition, at present, there is no record from which the Court can determine the extent to which Sidney City School officials have permitted, as a general rule, expressive activities on the grounds outside of the schools buildings on election days. Moreover, neither party has indicated whether Sidney City Schools has promulgated policies for the use of school facilities by the public, pursuant to Ohio Rev.Code § 3313.77, which might be relevant to this litigation. *See* Ohio Rev. Code § 3313.77 (indicating permissible uses of school property for public functions, and requiring the board of education of each school district to adopt a policy for the use of school facilities by the public). Accordingly, although the Court cannot conclude, as a matter of law, that Sidney City Schools has not, by policy or practice, opened up public school property for campaigning and other expressive activities on election days, Plaintiffs have not alleged facts to support the contention that they *have* done so. Accordingly, Defendants' Motion to Dismiss, pursuant to Fed.

R.Civ.P. 12(b)(6) (Doc. # 8), is SUSTAINED.[13]

For the foregoing reasons, Defendants' Motion to Dismiss, pursuant to Fed. R.Civ.P. 12(b)(6) (Doc. # 8), is SUSTAINED. Given that a school district may, through policies or practices, designate school property as a public forum, the Court will allow Plaintiffs to file an amended complaint, within twenty (20) days from date, subject to the strictures of Rule 11, setting forth allegations to support their contention that Sidney City Schools *has*, by policy or practice, so designated school property as a public forum, for the purpose of campaigning and other expressive activities, on days when the school is being used as a polling site.

---

**13.** Because Plaintiffs have not alleged facts that the school properties at issue were designated public forums, allowing for the collection of referendum signatures, the Court need not address whether Sidney City Schools acted with sufficient justification when it asked Plaintiffs to leave the school property. Accordingly, that issue will not be addressed herein.